TRUST COMPANY OF GEORGIA *et al. v.* STATE OF GEORGIA.

1. When an action is instituted in the name of the State for the purpose of preventing a violation of the provisions of par. 4, sec. 2, art. 4 of the constitution (Civil Code, § 5800), the questions whether such action is well brought and is maintainable depend upon the pleadings and the evidence introduced in support thereof, and not upon the motives inspiring those at whose instance the Governor was induced to order the suit to be filed, or the arguments presented to him to that end.

2. The remedy for such a purpose may be injunction, and it is not in every instance essential to resort to the harsher proceeding to forfeit a charter.

3. That portion of the above-mentioned paragraph of the constitution which denies to the General Assembly "power to authorize any corporation to buy shares or stock in any other corporation" is not absolute in its terms;

but it was designed only to prevent the General Assembly from authorizing one corporation to purchase shares or stock in another, when doing so "may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly."

4. This clause of the constitution applies to and includes all corporations; and, consequently, is applicable to street-railway companies, and enforceable as to them whenever they, directly or indirectly, violate its provisions.

5. Under the charter of the Trust Company of Georgia, that corporation has authority to buy the shares or stock of any other corporation; provided that, in so doing, it does not violate the provisions of the constitution of this State.

6. Placing upon the word "competition," as used in this paragraph, the interpretation given to it in the case of *State of Georgia* v. *Central of Georgia Railway Company*, ante, 716, and taking into view the evidence in the present record, the court erred in holding that the proposed purchase of stock would be violative of the constitutional provisions referred to, and in granting, on that ground, the injunction sought.

Argued January 16, 17, — Decided February 27, 1900.

Injunction. Before Judge Candler. Fulton county. November 7, 1899.

*King & Anderson, Lewis W. Thomas, Goodwin & Hallman, C. P. Goree,* and *Payne & Tye,* for plaintiffs in error: Suits of this kind should not be entertained when inspired by rival interests: 3 Cook, Corp. § 913, p. 2231; 50 N. E. Rep. (Ill.) 158. Governor not empowered to order this suit by virtue of his office only; legislation necessary. The anti-trust law (Acts 1896, p. 68) expressly authorized suit, and the anti-pooling law (Civil Code, § 2085 et seq.) defined a method of procedure. Quo warranto the proper remedy; direct suit in the name of the State for injunction not proper; the proceeding should have been on the relation of the attorney-general: 5 Thomp. Corp. §§ 6133, 6035, and notes; 27 Am. & Eng. Enc. L. (1st ed.) p. 410; High, Extraord. Rem. § 660; 76 *Ga.* 644 (1), 648; 24 N. Y. 261, 268; 79 Mo. 632, 638 – 9; 157 Mass. 548. The constitutional provision upon which this suit is founded (par. 4 of sec. 2, art. 4, Civil Code, § 5800) is not self-acting; legislation to make it effective is indispensable. Nor does it apply to companies not engaged in the same line of business, e. g. a trust company and a street-railroad company, where the charter of the former authorizes it to buy stock in other companies. 62 Fed. Rep. 328

(1), 333, 334; Civil Code, § 5803.　Legislation carrying this article of the constitution into effect, as to steam railroads: Civil Code, §§ 2173, 2179, 2167; as to insurance companies: Id. § 2085 et seq.; as to articles of manufacture and agriculture generally: Acts 1896, p. 68.　There is no legislation carrying this article into effect so far as concerns a trust company buying stock in other companies.　Street-railroad companies are expressly authorized to sell or lease franchises; Civil Code, § 2184. Contracts of sale or lease will not be presumed illegal and enjoined, but will be permitted; and if the business is so conducted afterwards as to violate the law, the illegal use will be prevented. The general law as to steam railroads, as far as appropriate, is made applicable to street-railroads: Civil Code, § 2180.　The legislation embodied in section 2184 was enacted in 1891, at the time of the consolidation of the companies then brought together as the Atlanta Consolidated Street Railway Company (now the Atlanta Railway and Power Company, one of these plaintiffs in error); and several acts were passed at the same time, authorizing the companies to sell out to each other: Acts 1890 – 91, vol. 1, pp. 279, 283, and 340.　The legislature has recognized the right of street-railroad companies which have purchased the property and franchises of other companies, and has imposed on them the duties of the latter: Acts 1890 – 91, vol. 1, pp. 169, 170.　The charter of the Trust Company of Georgia expressly authorizes it to buy stocks of other companies.　A like provision appears in charters granted to trust and banking companies, almost universally, after the constitution of 1877 was adopted.　This continued legislation shows the construction by the legislature of the clause of the constitution above referred to.　That clause was only declaratory of the law as it existed prior to that time, and prohibited the legislature from making contracts unduly restrictive of competition: 104 *Ga.* 188.　If prices are not raised above reasonable amounts, though the contract be made to prevent competition, it is not void: 66 N. H. 100, s. c. 49 Am. St. Rep. 582, 584, 586.　There must be substantial competition, to render the consolidation illegal. Incidental competition, or competition insignificant in amount, when compared to the volume of business transacted by the com-

panies, will not render the combination illegal: 46 Fed. Rep. 888; 91 Fed. Rep. 317; 35 Atl. Rep. (Pa.) 952, 954; 111 N. Y. 64; 66 N. H. 100, 127; 49 Am. St. Rep. 582; 40 La. Ann. 8; Cook, Trade and Labor Combinations, 120. Legislation providing that ten miles shall intervene between railroads, as to their general routes, and making provision as to their approaching each other at terminal points, shows that ruinous competition is discouraged: Civil Code, § 2176. Not illegal for two corporations engaged in same general lines of business to consolidate: 62 Hun, 269, s. c. 133 N. Y. 336; 127 N. Y. 252. The leasing of competing lines, or bringing them under one friendly management, does not violate such a provision as that in our constitution: 53 Pac. Rep. 623. Street-railroad companies, from their nature, do not fall within provisions prohibiting combination to defeat competition: Booth, Street-Railroad Companies, § 429; 20 Atl. Rep. (Pa.) 399, 400. Corporations with the same officers can validly contract with each other: 57 *Ga.* 371; 55 Md. 420. Injunction harsh and not necessary; jury on final hearing can settle the matter: 37 Am. & Eng. R. Cas. 100 (2).

*J. M. Terrell, attorney-general, Gray, Brown & Randolph,* and *Frazer & Hynds,* contra: Suit properly brought in the name of the State: 79 *Ga.* 61; 81 *Ga.* 546; 85 *Ga.* 22; 66 *Ga.* 408; 56 *Ga.* 478; 25 *Ga.* 374; 43 *Ga.* 605, 656; 71 *Ga.* 106, 120; Civil Code, §§ 5813, 4933; Pol. Code, § 220, par. 4; 145 N. Y. 267–274; 24 Tex. 80; 4 Minn. 213, s. c. 3 L. R. A. 510; 5 Thomp. Corp. § 6614; 58 Pa. St. 45; 67 N. W. Rep. 1, 4; 35 Wis. 530; 134 N. Y. 269; 2 Cook, Corp. § 635; 97 Ky. 675; 161 U. S. 677; Civil Code, § 4878 et seq. The attorney-general the proper officer to bring the action in the name of the State, and injunction and receiver the appropriate remedy: 3 Pom. Eq. Jur. § 1093; 35 Wis. 434, § 524; 17 L. R. A. 108–111, s. c. 38 N. J. L. 286; Angell and Ames, Corp. § 734, p. 793, 795; 10 Mass. 290; 145 N. Y. 267, 274; 5 Wend. 212, 220; 50 N. J. Eq. 50, s. c. 17 L. R. A. 97; 19 Ala. 514; 67 N. W. Rep. 1; 2 Morawetz, Corp. § 1043; Beach, Monopolies and Trusts, § 221; 5 Thomp. Corp. § 6618; 50 N. J. Eq. 449, s. c. 17 L. R. A. 97; 7 Atl. Rep. 368, 374; Pol. Code, § 220. Under paragraph 4 of section 2, article 4 of the constitution (Civil Code, § 5800), the

General Assembly can not authorize one corporation to buy shares or stock in another. By the common law one corporation could not own stock in another. The import of the clause of the constitution in question may be regarded as prohibiting the legislature from changing the common law on the subject: 49 Fed. Rep. 424, citing 40 *Ga*. 582; 7 So. Rep. 108; 2 Cook, Stock and Stockholders, §§ 667–672; 139 U. S. 24–61; 37 Fed. Rep. 449–465. A constitutional provision is to be construed with reference to the principles of the common law. The framers of the instrument are presumed to have intended no change of the common law further than is expressly declared: 6 Am. & Eng. Enc. L. (2d ed.) 931, citing Cooley, Con. Lim. (6th ed.) 75; 118 Ind. 366; 9 Humph. 43, s. c. 49 Am. Dec. 697; 76 Ill. 370; 4 Mich. 322; 16 N. J. L. 380, s. c. 32 Am. Dec. 397; 71 Pa. St. 293. As to the power of competing railway corporations to consolidate under one ownership or to unite under one management: 6 Am. & Enc. L. (2d ed.) 825; 24 Neb. 164, s. c. 8 Am. St. Rep. 165–178; 66 N. H. 100, 131; 48 N. H. 325; 1 Tex. App. Civ. Cas. 324; 71 Fed. Rep. 787; 46 Fed. Rep. 152; 130 Ill. 268, s. c. 17 Am. St. Rep. 319; 62 N. H. 537; 36 N. J. Eq. 5; 121 N. Y. 582, s. c. 18 Am. Rep. 842; 86 Tenn. 598; 37 Fed. Rep. 449; 49 Fed. Rep. 412; 139 U. S. 24–63; 92 Fed. Rep. 735, 741–4; 55 N. H. 531; 72 Tex. 404, s. c. 1 L. R. A. 849; 101 U. S. 71; 50 Fed. Rep. 338; 17 L. R. A. 97; 24 N. J. Eq. 46; 41 N. J. Eq. 4; 69 Tex. 313; 161 U. S. 691–2; 48 N. J. L. 559; 118 U. S. 309; 130 Ill. 268, s. c. 8 L. R. A. 497; 77 Mich. 632, s. c. 6 L. R. A. 457; 9 L. R. A. 33; 5 L. R. A. 386; 15 L. R. A. (Ohio) 145; 68 Pa. St. 184; Beach, Priv. Corp. § 305, and cases cited; 92 Fed. Rep. 735; 161 U. S. 698–699; 75 Tex. 434; 1 L. R. A. 849; 41 La. Ann. 970, s. c. 17 Am. St. Rep. 445; 37 O. St. 590; 161 U. S. 648–676; Civil Code, § 2184. As to the right of the Trust Company of Georgia, under its charter, to hold stock in other corporations: Civil Code, § 1831; 40 *Ga*. 582, 620, 624, 625; 43 *Ga*. 13; 101 U. S. 71 (1); 62 Fed. Rep. 342; 139 U. S. 24–63; 49 Fed. Rep. 412; 5 *Ga*. 561; 25 *Ga*. 457; 95 *Ga*. 389; 7 *Ga*. 221; 8 *Ga*. 23; 11 *Ga*. 438; 9 *Ga*. 213; 8 L. R. A. 504–508; act incorporating the

"Commercial Travelers Savings Bank" (Acts 1890 – 91, vol. 2, p. 310), and amendment changing name to the "Trust Company of Georgia" (Acts 1893, p. 142). The power granted to buy and sell "stocks" was intended simply to clothe the bank with power necessary to accomplish the main purpose of its organization, namely, banking. The court should not only have granted an injunction, but appointed a receiver; 36 Ohio St. 355, s. c. 38 Am. Rep. 594; 68 Me. 46, 28 Am. Rep. 9; 139 U. S. 59; 53 Am. St. Rep. 415; Smith, Receivers, 364, and note; 50 N. J. Eq. 489; Civil Code, § 4900.

LEWIS, J. On the 1st day of July, 1899, certain citizens of Fulton county, Georgia, filed with the Governor of the State a petition charging that certain corporations, namely, the Trust Company of Georgia, the Atlanta Railway Company, and the Atlanta Railway and Power Company (formerly known as the Atlanta Consolidated Street Railway Company) had, by certain contracts and agreements, violated art. 4, sec. 2, par. 4, of the constitution of the State, and were about to enter into other contracts in violation of this clause of the constitution. They prayed for an executive order requiring the attorney-general to bring such suits in the name of the State as might be necessary to set aside such contracts and have them declared null and void. His Excellency, the Governor, passed an order directing a suit to be brought as prayed for, and accordingly the attorney-general filed, in the name of the State, a petition in the superior court of Fulton county against the corporations named. This petition alleged, in substance, that the Atlanta Railway Company for a number of years operated lines of street-railroads extending from the central portion of the city of Atlanta along Forsyth, Fair, Cooper, Richardson, and other streets to McPherson Barracks outside of the city, and in Fulton county, Georgia, in one direction, and by way of Forsyth, Church, Ellis, and other streets, to Decatur, in DeKalb county, Georgia, in another direction; also another line running along Forsyth, Cooper, and other streets to Grant Park, in said city. The Atlanta Railway Company purchased this property at receiver's sale, the former owner being the Atlanta Traction Company. The Atlanta Railway and Power Company during the same time op-

erated competitive lines of street-railroad, running on Decatur street, and other streets in the city of Atlanta, to Decatur; also along Alabama and Pryor streets and Georgia avenue to Grant Park in the city of Atlanta, and also along Fair street and Park avenue to Grant Park. Said company also operated a line out Whitehall street in said city, and had lately applied for a franchise running on and along various streets to McPherson Barracks, for the purpose of constructing a competing line with the Barracks line of the Atlanta Railway Company. It finally changed this franchise, and constructed a line practically to Fort McPherson. This company, the Atlanta Railway and Power Company, also owned and operated a line out Edgewood avenue to Inman Park, and beyond Inman Park to and along Euclid avenue to Moreland Park and the county line, where it paralleled and finally crossed the tracks of the Atlanta Railway Company. It also operated other lines competing with the Atlanta Railway Company at many points. The notable places of competition were in the vicinity of Grant Park, at Decatur, Moreland Park, Edgewood, the intersection of Pryor and Ormond streets, Whitehall and Fair streets, Peachtree and Ellis streets, Ellis street and Courtland avenue, Houston and Hilliard streets, Irwin and Jackson streets, Irwin street and the Boulevard. A map was attached to the petition, showing the various routes of the lines operated by the two companies.

The petition further charged that the Trust Company of Georgia had recently, contrary to the constitution and laws of the State, bought up all the stocks and securities of the Atlanta Railway Company for the purpose of causing said company to convey all its property to the Atlanta Railway and Power Company, or whatever new company should be organized, in order to control both systems of railway, and for the same purpose bought up all, or nearly all, of the stock of said Power Company, and is now practically the holder of all the stock of both companies. The Trust Company caused to be elected for the principal officers of the Atlanta Railway Company the same persons who were managers of the Atlanta Railway and Power Company, namely: Woodruff elected president of each company, Hurt, superintendent of each company, and Glenn, the

secretary of each company, so that the Atlanta Railway Company passed under the complete management of the officers who controlled the other company. Practically all the stock and securities of both companies were held and owned by the Trust Company of Georgia; and the Atlanta Railway Company was operated by persons who controlled both the Trust Company and the Atlanta Railway and Power Company. The purpose of the managers of the Trust Company was to have the properties of both these corporations conveyed, so that one corporation would own, control, and operate both properties, to the destruction of competition between the two. The combination results in injury to property along the lines of the railways, and at competing points, and, with the exception of about ten miles of tracks running along Walton and other streets to the Chattahoochee river, and lying mainly outside of the city limits, the other two lines of railway were the only two competing lines in the city. The petition alleges somewhat in detail that the effect of these contracts, which it attacks as illegal, has been to lessen competition at the various points named; that since the reported combination of the two lines, the service and accommodations thereon have not been as satisfactory to the people generally, and especially to those patronizing the street-railways. The petition charges that if the threatened illegal acts of the defendants are not enjoined, and the illegal combination be allowed to stand, the street-railway accommodations and facilities of the city of Atlanta, and the means of transportation for the people of Fulton and DeKalb counties and of the cities of Atlanta, Decatur, Edgewood, and Oakland City, and the people of the State visiting this territory, will be placed in the sole control and power of one corporation, competition will be excluded, and the rates of fare controlled in the interest of those connected with the monopoly. One among the prayers of the petition was, that the Trust Company be enjoined "from voting said stock in the Atlanta Railway and Power Company, and said stock in Atlanta Railway Company," and that two Railway Companies be enjoined from receiving the votes of said stock controlled by the Trust Company; that the Atlanta Railway and Power Company be enjoined from

purchasing or acquiring the ownership, control, or operation of the lines of railway, franchises, and property of the Atlanta Railway Company, and that it be enjoined from selling its roads, railways, franchises, etc., to the Atlanta Railway and Power Company, or any other corporation, that will have the effect to defeat or lessen competition, or to encourage monopoly ; that the defendant corporations be enjoined from entering into any agreement whatever by which the properties of said two railway companies would be consolidated, merged, or combined ; that a receiver be appointed by the court to take possession of the stocks and bonds of the Atlanta Railway Company, to hold, manage, and dispose of the same under the orders and direction of the court, in order that competition may be preserved, which was guaranteed to the public, and the public interests protected.    There was a prayer that a restraining order be granted, restraining the defendant corporations from doing or performing the acts against which injunction was prayed, until the final hearing of the cause.

To this petition each of the defendant companies filed demurrers upon various grounds; and the Trust Company, the Atlanta Railway Company, and the Atlanta Railway and Power Company filed their answers, specifically answering the charges in the petition; denying its various allegations about defeating or lessening competition, or tending to defeat or lessen competition ; denying that the two railway systems were competing lines in the sense of the constitution and laws of the State ; and setting up advantages that would accrue to the public generally if the two systems were consolidated, and particularly in respect to the reduction of fares by transfer tickets from the lines of one to the other, which would often enable passengers to travel for one fare on various routes through the city, which would otherwise require the payment of two fares.   In this way, expense in the operation of these various lines would be greatly reduced, accommodations and conveniences to the traveling public increased, roads better equipped, etc.   At the September term, 1899, of the superior court of Fulton county, the case came on to be heard on the prayers above stated, for injunction, receiver, etc., before Judge John S. Candler, of the Stone Moun-

tain circuit, who presided because of the disqualification of Judge J. H. Lumpkin, of the Atlanta circuit. Quite a volume of evidence was introduced both in behalf of the plaintiff and defendants. The decision of the judge on the issues made by the demurrers and answers was reserved until November 7, 1899. He enjoined the Trust Company of Georgia from selling or transferring any of the stock or bonds owned by it in and of the Atlanta Railway Company and the Atlanta Railway and Power Company, and from transferring any of the stock or bonds of the latter company to the Atlanta Railway Company, and from transferring the stock or bonds of either of the railway companies to any other company or association of persons, the object of which transfer would bring about the consolidation of the said street-railroad companies into one company. The Atlanta Railway and Power Company was enjoined from purchasing or in any way acquiring the possession or control of any of the stock or bonds of the Atlanta Railway Company, and the latter company was enjoined from purchasing or acquiring any of the stock or bonds of the Atlanta Railway and Power Company. Both companies were enjoined from taking up any of the tracks of their respective lines, or from discontinuing the running of reasonable schedules upon the same, without first obtaining the consent of the city or county authorities from whom they hold franchises, or without further order from the court in cases where said lines of road are not located in the streets of any city or town, or where the public roads are not occupied under franchises granted by county authorities. The judge denied the prayer for the appointment of a receiver, and further provided in his judgment that, as the interests of the two defendant street-railroad companies, as well as those of the public, may be subserved by the interchange of business between said roads, and by transfer of passengers from the lines of one road to those of the other, they were permitted to make any physical connections with the rails of each other, and enter into any such traffic arrangement as may be necessary to enable each of said companies to grant transfers or interchangeable tickets over the lines of the other. To this judgment of the court the defendant companies, in their bill of exceptions, assign error.

1. It appears from the record that the defendants' counsel called upon the plaintiff, or its attorneys, to produce, upon notice which had been duly served, the contracts between the parties petitioning the Governor to direct the suit brought, and also the contract under which the attorneys filing the suit were employed. In the bill of exceptions complaint is made that the court erred in not requiring the production of the papers called for. In the argument of the case here in behalf of the plaintiffs in error, it is contended that the contracts made by the parties petitioning the Governor would have disclosed that rival interests were actuating this proceeding, and that the contracts between counsel for defendant in error and their clients would have disclosed that their authority was limited to appearing before the mayor and council of Atlanta to prevent the removal of the tracks on Richardson street alone. It appears from the evidence that a petition was presented by the president of the Atlanta Railway Company to the city council of Atlanta, asking for the privilege of removing the tracks of that company on Richardson street. This was protested against by certain citizens on that street; whereupon the application for removal of such tracks was withdrawn by the president of that company. It further appears that the names of those persons appearing in the petition presented to the Governor for this suit were some of the citizens on that street. We think it was immaterial in this case to have entered into an investigation as to the motives of the parties who petitioned the Governor for the institution of this suit, with the view of determining whether the cause of action was properly brought. That question, as to whether the action is well brought or maintainable, must necessarily depend upon the pleadings before the court trying the case, and the evidence introduced in support thereof. The court trying the issue has nothing to do with the motives actuating the parties who instigated the proceedings before the Governor. The Governor is presumed to take care of himself in such matters; and we do not think that his action is the subject-matter of review by the courts in a case that he has directed to be brought. We are inclined to the opinion that the attorney-general has the power to institute suits necessary to the protection of the inter-

ests of the State; in case, for instance, where the State's prop-
erty is involved, or where public rights are jeopardized, with-
out direction from the Governor; but when directed by the
Governor, as in this case, to proceed, he has no discretion in
the matter, but should obey the mandates of the chief executive.
Whether or not the action is maintainable is dependent at last
upon the pleadings, and the evidence introduced in support
thereof, and not upon the motives inspiring those at whose in-
stance the Governor was induced to order the suit filed.

2. Among the several grounds of demurrer, the main one
that seems to be relied upon by counsel for plaintiffs in error
is, that the suit was improperly brought in the name of the State
for injunction, but that quo warranto was the proper remedy
for the wrongs complained of, and the proceeding should be on
the relation of the attorney-general. Upon this point neither
the authorities in England nor in this country are entirely rec-
oncilable, some holding that the remedy by injunction in favor
of the State will not lie to restrain a corporation from the exer-
cise of powers ultra vires; and others holding that this is the
proper remedy. We have reached the conclusion that the
sounder reasoning is in favor of allowing to the State relief by
injunction whenever it is proceeding in the interest of the pub-
lic to prevent a threatened injury. As harsh as the remedy by
injunction is generally considered, it is certainly not as severe
as would be a proceeding in the nature of quo warranto, insti-
tuted for the purpose of forfeiting the charter of a corporation.
The one is instituted, not for the purpose of causing a destruc-
tion of the corporation, but to prevent it from entering into trans-
actions violative of the public policy of the State, and to protect
the interest of the public against a threatened wrong. The other
remedy, if enforced, would cause the death of the corporation,
thus forever preventing it from serving the public interests, or
meeting the public demands upon its business, and often result
in a wreckage of the property of its owners. We can, there-
fore, see no reason why, if the remedy for the wrongs threatened
can be as well prevented by injunction, it would not be the more
readily and properly applied than the harsher one of forfeiture
or confiscation. This question is discussed in 2 Cook on Cor-

porations, § 635, p. 1223. It is there recognized that the State has four remedies for relief against corporations exercising powers ultra vires: 1st. The legislature may repeal the charter of the corporation under the reserved right of the State to repeal; 2d, or the State may institute a proceeding to forfeit the charter for misuser of powers; 3d, or such proceeding may be only to oust the corporation from the exercise of the usurped power; 4th, or, according to some authorities, a suit may be commenced in equity for an injunction restraining the corporation from committing the ultra vires acts. On page 1227, however, the author says, "it is very doubtful whether the State may file a bill in equity to enjoin a corporation from committing an ultra vires act. The remedy of the State is quo warranto." The author recognizes, however, considerable English and American authorities to the contrary. In this same connection he declares: "The State may enjoin a railroad corporation from purchasing a competing line in violation of the constitution." While we gather from the entire text that the author seems to conclude that the weight of authority is that the remedy of the State is by quo warranto, and not by bill in equity for an injunction, we do not think all the authorities cited in support of the text fully sustain it. For instance, in the case of Attorney-General *v.* Great Northern Ry., 1 Dr. & Sm. 154, it was held that the attorney-general can not enjoin a corporate act merely because it is ultra vires. Some injury to the public must be involved. The attorney-general's suit, at the instance of a manufacturer, to enjoin one railroad from leasing its rolling-stock to another failed. This decision probably at last gives the clue by which apparent conflict of authorities on this subject may be reconciled, and we think it is the correct doctrine. The State has no right to an adjudication by the courts declaring void such contracts merely and solely for the reason that they are ultra vires, but she is entitled to this relief when injury to the public is involved.

This question was directly made in the case of L. & N. Co. *v.* Commonwealth, 97 Ky. 675. It was there held: "A court of equity has jurisdiction in an action by the State to enjoin a corporation from exceeding its chartered powers, or doing acts

otherwise illegal and injurious to the public.    Therefore the State may by injunction prevent a railroad company from consummating the purchase of a 'parallel or competing line' in violation of sec. 201 of the State constitution."    This case was carried to the Supreme Court of the United States, and there the judgment was affirmed.    See L. & N. Co. v. Kentucky, 161 U. S. 677.    In Attorney-General v. Chicago Co., 35 Wis. 425 et seq., this right of the State, acting through the attorney-general, and the remedy by injunction, are clearly recognized.    See headnotes 4 and 43.    In that case an elaborate opinion was written, thoroughly discussing this subject, which will appear on pages 523 to 553, where the decisions both in England and this country are well considered and analyzed.    It was there concluded that the English court of chancery entertains jurisdiction in such cases, and it was declared that the English books leave little room for a denial of such jurisdiction.    On page 532 it is stated : "We have not found this jurisdiction as directly and succinctly stated in American treatises as in English, although it is fully recognized by the best of our elementary writers."    The author quotes from 2 Redfield on Railways the following principle : "Injunctions in courts of equity, to restrain railways from exceeding the powers of their charters, or committing irreparable injury to other persons, natural or artificial, have been common for a long time, in England and this country."    Says the court in the Wisconsin case above cited, on page 524, in speaking of the right to proceed by injunction :    "It seems to proceed on the presumption that it may better serve the public interest to restrain a corporation, than to punish it by penal remedies or to forfeit its charter."    In Attorney-General v. Delaware Co., 27 N. J. Eq. 631, it was decided :    "The attorney-general has the right, where the property of the sovereign or the interests of the public are directly concerned, to institute suit for their protection by an information at law or in equity, without a relator."    See also Stockton v. Central Co., 50 N. J. Eq. 52, where the court enjoined lease upon application of attorney-general, when its effect was to create a combination in transportation of coal, and to destroy competition in production and sale.    See also State v. Merchants Ins. Co., 8 Humph. (Tenn.) 235–254, where in-

surance company was restrained from banking. We quote the following from Pomeroy's Equity Jurisprudence, § 1093, p. 1263: "When the managing body are doing or are about to do an ultra vires act of such a nature as to produce *public* mischief, the attorney-general, as the representative of the public and of the government, may maintain an equitable suit for preventive relief." In a note to that text it is recognized that some of the cases seem to hold that the attorney-general may thus interfere to restrain *every ultra vires* proceeding of a corporation, on the ground that the public and governmental rights must necessarily be invaded thereby. But it is declared: "The later decisions, however, have established the limitation as stated in the text."

As far as our investigation has extended in reviewing the authorities cited to the contrary in the text-books, and by counsel for plaintiffs in error, we fail to find such conflict as seems to be contended for. For instance, in the case of Attorney-General *v.* Tudor Ice Co., 104 Mass. 239, it was simply decided that there is no jurisdiction in equity of an information by the attorney-general against a private trading corporation, whose proceedings are not shown to have injured or endangered any public or private rights, and are objected to solely on the ground that they are not authorized by the act of incorporation and are therefore against public policy. Gray, J., in his opinion in that case on page 242, draws a clear distinction between that case and modern English cases upon the subject. He says: "The modern English cases, cited in support of this information, were of suits against public bodies of officers exceeding the powers conferred upon them by law, or against corporations vested with the power of eminent domain and doing acts which were deemed inconsistent with rights of the public." In 2 Johnson's Chancery, 370, it was held that equity had no jurisdiction over offenses against a public statute, or to restrain a person from carrying on the business of banking in violation of a certain act of the legislature, and motion to enjoin by the attorney-general was refused. But in the opinion delivered in that case, on page 377, it was stated that the acts complained of were too much in the nature of a criminal of-

fense, penalty being prescribed therefor by the statute; and on pp. 378–380 of the same opinion it appears that no public mischief was threatened in that case, and hence it was distinguished from several cases cited in which this remedy was recognized as a proper one in case public interests were involved.

Our conclusion, therefore, both from reason and a decided weight of authority, is that the State, in her sovereign capacity, can appeal to the courts for relief by injunction, whenever either its property is involved, or public interests are threatened and jeopardized by any corporation; especially one of a public nature like a railroad company, seeking to transcend its powers, and to violate the public policy of the State. We think this court has clearly recognized this sovereign right of the State. As stated by Judge Warner in *Central Co.* v. *Macon*, 43 *Ga.* 642, "If the State had any interest in the controversy, it was in her sovereign capacity as the representative of the whole people of the State, and should have appeared before the court in her sovereign capacity, by the appropriate mode of procedure in such cases." We are equally well satisfied of the correctness of the proposition that if the State has no interest in the matter in controversy, she will not be heard to ask for such extraordinary relief; and she can have no interest, unless her property rights or the public interests are involved. The allegations in the petition for such relief in this case are sufficiently full, clear, and explicit touching the rights of the public involved to give the court jurisdiction of the complaint, and we therefore think there was no error in overruling the demurrer.

It is further contended by counsel for plaintiffs in error that the constitutional provision in question is not self-active, and that some legislation was necessary in order to give a court of equity jurisdiction to grant the extraordinary relief prayed for. This question was practically decided in *State* v. *Central Ry. Co.*, ante, 716, where it was held that the provision in the constitution in question declared no new principle, but was simply the embodiment of the common law. In sustaining the jurisdiction of courts of chancery in such mat-

ters both in England and this country, the decisions are really based upon the principles of the common law, and not upon special legislation prescribing the particular procedure that should be instituted in court in such cases. This will clearly appear by an investigation into the cases above cited.

3. It is further contended that under the constitution (Civil Code, § 5800), the provision in relation to corporations buying shares or stock in any other corporation has no reference whatever to the effect of such purchases upon competition or monopoly, and that they are absolutely void, although they have no tendency to defeat or lessen competition, or to encourage monopoly. We think this is an entire misconception of this provision in the constitution. The prohibition against the legislative grant to corporations of power to buy shares or stock in another corporation is clearly qualified by that portion of the section cited which restricts such purchases only when they have the effect, or are intended to have the effect, to defeat or lessen competition in their respective businesses, or to encourage monopoly. This necessarily follows from the punctuation of the clause itself. That portion of it in relation to the purchase of shares or stock is only separated from the balance of the sentence by a comma, and the relative clause that follows with the words, "which may have the effect," we think was evidently intended to relate to what was said about shares and stock, just as much as to the words "contract, or agreement." If the convention that framed the constitution intended to enact an absolute prohibition against the purchase of shares or stock by one corporation from another, their meaning could have been made manifest and clear by a separation of the first clause either by a period, or semicolon, from what followed; and if such had been the purpose of the convention, the construction of the sentence as to its punctuation would evidently have been quite different. Besides, the view of an absolute prohibition of such a sale and purchase would be entirely inconsistent with the provision in the constitution just preceding, embodied in section 5799 of the Civil Code. In that section the policy is indicated of encouraging "any existing road to take stock in or aid in the building of any branch road." Our view of this

question has been the uniform construction placed upon this provision in the constitution by the legislature after its adoption. One of the first charters granted by the legislature after adoption of this constitution will be found in the Acts of 1878 – 9, p. 196, where the power of a corporation to invest its money "in any good stocks" was granted. Various acts were passed by subsequent legislatures delegating to corporations the power of purchasing and selling stock. It is true such acts would be void if clearly shown to be in violation of a constitutional provision; but we think the legislative construction in this matter was reasonable and proper, and if there be any serious doubt as to what the convention meant by the words employed, the benefit should be given to the interpretation placed upon it by the legislative branch of the government, and acted on for over twenty years by the people of the State in transactions involving important rights. See *County* v. *Thompson*, 83 *Ga.* 274 – 5. We are cited by counsel for plaintiffs in error to the decision of Judge Speer in the case of Hamilton *v.* Ry. Co., 49 Fed. Rep. 412. It will be seen in the opinion on page 422 that Judge Speer endorsed a statement relating to this question, made by Mr. Walter G. Charlton, in which an analysis of the section of the constitution under consideration was made, to the effect that what the provision meant was, that the General Assembly shall have no power to authorize any corporation to buy shares or stock in any other corporation in this State or elsewhere, which may have the effect, or be intended to have the effect, to defeat or lessen competition in their respective businesses.

4. It was further contended by counsel for plaintiffs in error, that street-railway companies, from their very nature, do not fall within the provisions of statutes or constitutions prohibiting combinations to defeat competition. From the language in section 5800, it was evidently the intent to apply the principle to all corporations, for it declares, "The General Assembly of this State shall have no power to authorize *any* corporation to buy shares or stock," etc. There is certainly, then, nothing in the words used to authorize the inference that street-railway companies were not contemplated just as much as any other corporation. This construction of the constitution was placed on it

by the legislature under the acts of 1880–1, p. 170, embodied in the Civil Code, § 2184. There the power was given street-railroad companies to lease or sell their road, franchises, and other property to any other corporation for street-railroad purposes; but it is stipulated that the act shall not be construed to authorize any such company to sell, lease, or otherwise dispose of any of its property or franchises so as to defeat or lessen competition, or to encourage monopoly. The only authority relied on by counsel is Booth on Street Railways, § 429, which simply refers to a decision on this subject by the Supreme Court of Pennsylvania. The case referred to is Appeal of Montgomery, which will be found reported in 20 Atl. Rep. 399. It was simply held in that case that, on account of the meaning in which the terms "railroad" and "railway" were used in the constitution of Pennsylvania, the word "railroad" applied to steam railroads, and "railway" to street-railways; and that, therefore, the provision in the constitution against consolidation of "railroads" with parallel or competing lines did not apply to street-railway companies, and the latter, though parallel, would not be enjoined from consolidating. It is quite patent, then, that this authority has no bearing upon the question before us, for the word employed in the constitution of this State is neither "railroad" nor "railway," but "*any* corporation." It is true it may be a much more difficult matter to show that by a consolidation of street-railways in a populous city any effect is had upon competition and monopoly contemplated by the constitution. On page 400 in the Pennsylvania case cited, Green, J., delivering the opinion, said: "It is quite clear that the sense of 'competing,' which is the essential sense of the prohibition, is not applicable to the travel upon the streets of cities and towns over passenger railways." He further said: "The travel over parallel streets is not necessarily a competing travel. Each street has travel of its own which is conducted upon its own railway." But the argument of the court in that case only tends to show the greater difficulty in showing a defeating or lessening of competition to the injury of the public by combining two parallel street-car lines than would be the case between two steam railroads engaged in competition for traffic between dis-

tant points. The question is, at last, one of fact, and in its adjudication in any particular case the courts should be governed by the fundamental principle as to whether there was such a creation of a monopoly or defeating of competition as would result in injury to the public.

5. It is further insisted that the Trust Company of Georgia has, under its charter, no power to purchase stock in other corporations. It is claimed that it was chartered as a banking company, and that the investing in stock in railroad companies has nothing whatever to do with the business for which it was created. It is true that this Trust Company was incorporated by an act approved September 21, 1891, as the Commercial Travelers' Savings Bank. Acts 1890–91, vol. 2, pp. 310–313. That act was amended so as to change the name and capital stock. Acts 1893, p. 142. In the original act are incorporated and made a part of its charter the provisions in sections 6, 7, 8, and 11 of an act to incorporate the Oglethorpe Savings and Trust Company, approved December 18, 1886. By reference to the provisions in that act, it will be seen that there was an unmistakable delegation of power by the legislature to this Commercial Travelers' Savings Bank, now known as the Trust Company of Georgia, to purchase stock. It further appears from the record that while it was chartered as a banking company, other powers were given it almost ad infinitum; and that the main business it has been following is that of a trust company, rather than a regular banking company. It is insisted by counsel that there was at *common law* no power in any corporation to purchase stock in another; but it is equally true that at common law corporations had no power to make contracts or enter into transactions that would defeat competition or promote monopoly. But it has never been questioned that, in the absence of any constitutional provision on the subject, the legislature can confer such power upon corporations. The truth is that a corporation, which is a creature of the State, can exercise no power except what is delegated to it expressly or impliedly by its creator, the legislature. This power of purchasing stock the Trust Company of Georgia has, under its charter, and the only limitation upon it is that it can not exercise it for the purpose

of creating a monopoly or defeating competition, to the injury of the public.

6. The only question remaining in this case for consideration is whether or not, under the evidence before the judge below on the trial of this application for temporary injunction, such wrong, injury, or damage to the public interests was either contemplated or threatened as would justify a court of equity in granting the prayers of the petition. The interpretation given the word "competition" in the case of *State* v. *Central Ry. Co.*, ante, renders it unnecessary to enter into a further discussion of that subject. It is well enough, however, to bear in mind in this connection the vast difference between the business of street-railway companies, constructed generally simply for the purpose of passenger travel from one portion of a city to another, and steam railroad companies, whose business is the transportation of freight and passengers for long distances, and involving business in extensive territory. The Atlanta Railway and Power Company, formerly known as the Atlanta Consolidated Street Railway Company, owned and operated about 65 miles of street-car lines. This company was formed in 1891 by a consolidation of half a dozen street-car companies, each of which operated independently a line of small mileage, some run by dummy, and some by horse or mule power, and none of them having systems of transfers, or extending through-lines across the city. The evidence shows that in many instances these lines were parallel to each other, running upon streets only a block apart for considerable distances, and at many places crossing or intersecting each other. These systems were in 1891 brought together and consolidated, not only under authority given by the city council of Atlanta, but under general and special legislative enactments of the General Assembly. See Civil Code, § 2184. For the special act on this subject see Acts 1890–91, vol. 1, p. 279, where the Metropolitan Street Railroad Company was authorized to extend and operate its road in any part of DeKalb and Cobb counties, increase its stock to a million dollars, and to sell its railroad property and franchises to any other company ; also to purchase property and franchises of any other company, or to unite with the same, and

in such event to change its name to the Consolidated Street Railroad Company of Atlanta.   See also special acts in same volume on pp. 283 – 340.   After this consolidation the lines were electrically equipped.   It does not appear that there has been any opposition to this consolidation during the eight or nine years of its operation, and the record indicates that it was of great benefit to the public by the connection of disconnected lines, and affording to the public generally much greater facilities for transportation.   The other defendant, the Atlanta Railway Company, comprised a system of about 15 miles of street-car lines.   It was composed of two companies known as the Atlanta City Street Railroad Company and the Atlanta Traction Company.   These two companies, after existing for several years, became unsuccessful in business, passed into the hands of a receiver, and were finally consolidated by purchase and combination as the Atlanta Railway Company.   This last-named company had never paid any dividends to its stockholders, according to the evidence, and had acquired from the city franchises to enter territory into which no street-car lines had been built, but for want of means was unable to avail itself of this privilege.

It is contended in behalf of counsel for the Trust Company of Georgia, that that company realized that the Atlanta Railway Company was not in a position to complete the lines under the franchises it had acquired, thus making of it a really important system, and if the lines of that company should then be connected with those of the Atlanta Railway and Power Company, and transfers issued to and from all the lines of the entire system, there would be an increase in the volume of business, because of increase in facilities to the public, and that the public would even be more benefited by this arrangement than it had been by the consolidation in 1891.   It was made patent that with the disconnected lines a passenger, by paying the usual fare of five cents, could only go in one direction, and only to a point on the line which he first takes; and with the separate lines connected, one could start upon any line of the system, and for the same fare, by procuring a transfer to any other line in the system, he could reach at the same expense any point

upon any of the lines that are controlled by the entire system. It further appears from the evidence that a street-car company could not be operated except at a loss, unless there was considerable patronage from those resident along the route of line it operated ; that short-trip passengers left a profit with the company which would pay the expenses of transporting the one taking the long trip.    We think the evidence in this record fully sustains the conclusion to say the least of it, that the consolidation of these two lines would probably lead to granting the public generally along their routes greater, and less expensive, facilities and conveniences of transportation.    This is certainly a most important consideration, when a court of chancery is appealed to to restrain by injunction the accomplishment of such an end ; for the only business of street-car companies is the transportation of passengers who patronize their lines.    This record indicates there was on the trial below testimony from over 100 witnesses to the effect that a combination of these two systems, as contemplated, would inure to the general interests of the people interested in the operation of these roads as means of transportation.    After a careful review of the entire testimony in the case, which consumed about one and one half days of our time in its investigation, we have reached the conclusion that there is really no serious conflict among the witnesses touching the general effect upon the public interest of the transactions sought to be enjoined. The main point of conflict seems to us to be limited to certain intersections and terminal points of these two railway companies.    There was a quantity of evidence introduced in behalf of the State, showing competition at some intersections of these roads within the city, and also at some of their terminal points. There was, on the other hand, much evidence in behalf of the railway companies, showing that whatever competition existed at these points was insignificant in its nature, and amounted to nothing compared to the extent of the business transacted by the companies.    There was testimony in behalf of the State to the effect that while these two lines were running absolutely independently one of the other, schedules at some points were so arranged as to be more convenient to the public ; and on the other hand, there was testimony in behalf of the railway compa-

nies to show that at other points schedules and accommodations to the public were increased since the two roads were acting more in harmony one with the other.

In this connection we will allude to the Decatur lines of the two roads as being the lines which counsel seem to insist upon were most strongly in competition with one another. This line of the Power Company runs from near the centre of the city to Decatur on the north side of the steam railroad. The other line also runs from near the centre of the city on the south side of the steam railroad. They both terminate in the town of Decatur at points about 500 or more feet apart. Under the evidence there was no competition whatever, it seems, between them after leaving Decatur along their routes to the city, their distance being about a mile or more apart; and the evidence shows that the amount of business at Decatur, where there was some competition for passengers en route to Atlanta, did not amount to more than eight per cent. of the entire business of the line. We will not undertake to give in this connection a synopsis of the conflicting evidence touching the competing points on these lines, particularly at Grant Park, Oakland, Fort McPherson, and some points of intersection on the streets. Our conclusion is that the evidence, fairly considered, is that the competition at these points is unimportant and insignificant, when compared to what appears to be the general interests of the public, and to the amount of business done by these companies along their lines where no manner of competition exists at all. Street-car companies, like all other transportation companies, should be operated in such a way as to afford the greatest convenience, comfort, and facilities for traveling to the greatest number of people who live near enough their lines to want, and to be able readily, to use them for transportation. It is utterly impracticable for the same facilities to be granted every one, so that the people at every point would fare exactly alike; and when the question arises whether a few shall suffer some inconsiderable inconvenience by the inauguration of a system which is of advantage to the general public, we know of no safer principle to apply than the old adage of "the greatest good to the greatest number." In any event, as

we think we have shown both by reason and authority, whenever the State proceeds in such a matter in its sovereign capacity, in law the foundation of its action must be based upon the public good, and when it fails to show any danger to the public interests, an action of this sort fails.

The judge below in his decision states that the determination of the matter before him "rests upon the finding as to the truth of the following questions of fact, viz.: "Does the consolidation of these two street-railroads in question defeat competition at any point, on any of their lines? Does it tend to defeat competition? Does it lessen competition? If either proposition, under the evidence offered, is determined in favor of the petitioner, then such consolidation will be violative of the organic law of the State, and will not be permitted." It is true this court has repeatedly decided, and it is unquestionably a sound rule in such matters, that when a decision of the court below granting an interlocutory injunction is based upon a conflict of evidence, if there be sufficient testimony to sustain the judgment of the court below, under the law, its discretion in granting or refusing an injunction will not be controlled. The question involved in this case, as well as in nearly all cases which are litigated, depends upon the facts developed by the evidence. But evidently, from the decision itself, we think the judge below, in reaching a conclusion on the case, has applied to it a wrong principle of law. His conclusion is, if the consolidation of the two street-railroads defeats competition at *any point* on any of their lines, or tends to defeat such competition or lessen it, the courts will interfere to restrain and set aside such a combination. This thought in his opinion, coupled with the character of the evidence in this record, which we have only in general terms undertaken to outline above, we think necessarily leads to the conclusion of misconception on the part of the judge below as to the true meaning and spirit of the constitution and laws of the State on this subject, as construed by this court in the case of *State* v. *Central Ry. Co.*, supra. We, therefore, conclude that the judgment of the court below granting the injunction prayed for should be reversed.

We have said nothing in the foregoing opinion touching the

allegations in the pleadings and the evidence in regard to the Atlanta Railway Company removing its tracks from Richardson street.   The judge below, in his judgment, enjoins the street-railroad companies from taking up any of the tracks of their respective lines.   In the bill of exceptions the plaintiffs in error expressly "except to so much of the order as prohibits them from taking up any part of the tracks of their respective lines, except the track of the Atlanta Railway Company on Richardson street, particularly referred to in the petition."   The effect of not excepting to that portion of the order leaves that part of the court's order unaffected by this judgment.

In giving the reasons for his judgment, the judge below says: "Where these lines are in cities, and where they hold their franchises from city government, it is possible for them to be controlled, but large parts of the lines of each of these companies are located outside of cities and are not even located on public roads."   We think, however, in the consideration of this case, although some of the lines run in the country, and in an adjoining county, yet all of them being connected with the lines permeating the city in various directions, constituting a comparatively small portion of a grand system of street-railways, the effect of consolidation upon the public generally should be considered, including not only the interests of the people in the country (and, so far as the record discloses, they do not seem to be complaining) but also the people interested on all portions of the lines.   In the latter part of his decision the judge states: "Believing, further, that the interests of the two defendant street-railroad companies, as well as those of the public, may be subserved by the interchange of business between said roads, and by transfer of passengers from the lines of one of the roads to those of the other, said companies are permitted to make any physical connections with the rails of each other, and they are further permitted to enter into any traffic arrangement, as may be necessary to enable each of said companies to grant transfers or interchangeable tickets over the lines of the other."   The evidence is uncontradicted that the purpose of the transactions among the defendant companies was substantially to effect this result; that the Trust Company purchased the stock in both com-

panies, and the bonds in one of them, none of which it now holds, but it seems had sold or hypothecated them for the purpose of raising money, partly with the view of carrying out this scheme, and also with the view of aiding the Atlanta Railway Company in completing its contemplated lines through territory and to points in the city where it seems there are but little or no street-car accommodations.  While the judge seems to recognize in this connection the public interests, yet the effect of his injunction, it seems to us, would be to restrain the parties in such a way that they could not avail themselves of the means of accomplishing the end which he himself thinks desirable.     *Judgment reversed.  All the Justices concurring.*