HART, attorney-general, v. ATLANTA TERMINAL CO. et al.

1. Without reference to the legality or illegality of the claim-check system as originally practiced, it was alleged and evidence was introduced to show that it had been abandoned; and there was no evidence of an intention to reinstate it.    Under these conditions, there could be no abuse of discretion in refusing an injunction in regard to it.

2. In the case of Kates v. Atlanta Baggage Co., 107 Ga. 637, after announcing that, "Relatively to passengers and their baggage, the duty of a railway company, in its capacity as a common carrier, begins with affording to them, and to all of them alike, proper and suitable facilities for entering depots to purchase tickets and take passage, and for checking baggage, and ends with affording to them like facilities for leaving such depots and obtaining their baggage on presenting the checks therefor," the court decided, that, "If a railway company in good faith complies with the law as above laid down, it does not violate any public duty or deprive any citizen of any lawful right by granting to a single corporation or individual the exclusive right of entering its trains to solicit the transportation of passengers and baggage, or by renting to such corporation or individual a portion of its baggage-room and conceding to it or him the privileges necessarily incident to the occupancy and use thereof, provided that so doing does not interfere with the exercise by any other person of any right which he may lawfully demand of the company as a common carrier." This decision was concurred in by the entire bench of six Justices. Upon review it can not be reversed except by the concurrence of the entire bench; and in this case the decision must stand, as a sufficient number of Justices do not concur in order to overrule it.

3. The questions of law in the present case (the claim-check practice not being now involved, as stated in a previous note) are substantially controlled by the decision in the case above referred to.

4. On the questions of fact as to the actual practice followed in regard to baggage, and other issues of fact, the evidence was conflicting, and there was no abuse of discretion on the part of the presiding judge in denying an injunction.

5. The Governor of the State passed an order, "directing that the attorney-general file appropriate proceedings in the proper courts in the name of the State, to correct the wrongs to the people complained of." In the action brought the petition stated that "This suit is instituted by virtue of an executive order made by Honorable Joseph M. Terrell, Governor of Georgia, on the .... day of May, 1906, in pursuance of his authority as chief executive of the State of Georgia, and in pursuance of the authority vested in the Honorable John C. Hart as the attorney-general of the State of Georgia." Held, that the suit was substantially one by the State, and upon special demurrer raising the point that it was brought in the name of the attorney-general instead of in the name of the State, it could be amended.

6. In a case such as that made in the petition, brought for the benefit of the public, an application for injunction would be an appropriate rem-

edy, if the facts justify it; and the exclusive remedy was not by writ of mandamus.

7. The rulings complained of as to evidence were not such as to affect the decision above made.

Argued February 4,—Decided July 18, 1907. Judge Freeman, of the Coweta circuit, was designated to sit in this case, the Chief Justice being absent.

Petition for injunction.    Before Judge Pendleton.    Fulton superior court.   November 3, 1906.

*John C. Hart, attorney-general, John L. Hopkins & Sons,* and *Arnold & Arnold,* for plaintiff.

*Dorsey, Brewster, Howell & Heyman, Hubert Haas,* and *Rosser & Brandon,* for defendants.

FREEMAN, J. The rulings of the majority of the court are contained in the headnotes; and in the discussion which will follow, anything that may be said which is in conflict with such rulings is to be understood as setting forth merely the individual views of the writer.

During the year 1906 the American Baggage and Transfer Company filed a bill against the Atlanta Baggage and Cab Company (hereinafter called the Cab Company) and the Atlanta Terminal Company (hereinafter called the Terminal Company), wherein it was sought to enjoin the grant by the Terminal Company to the Cab Company of the use of a system of "claim checks," and for the purpose of having declared void a certain contract between the Terminal Company and the Cab Company, on the ground that such contract was in violation of the constitution, art. 4, sec. 2, par. 4. Upon a trial had in that case before the judge, a temporary injunction was granted, to which judgment there was exception to this court; and on May 24, 1906, the judgment of the court below was reversed, as will be seen from a report of that case in 125 *Ga.* 677. Afterwards, upon application of the Transfer Company, the Governor authorized this suit to be brought by the attorney-general. The petition avers, that the Terminal Company is a railroad corporation of this State, that the Cab Company is a corporation, and that the Terminal Company is the owner of the Terminal Station in the City of Atlanta, which is used for the arrival and departure of trains of the Southern Railway, the Atlanta & West Point Railroad, and the Central of Georgia Railway. The railroad companies are made

parties to the suit.  The Terminal Company and the railway companies filed separate answers.  The judge refused the injunction prayed for, and the plaintiff prosecuted a writ of error to this court.  The pleadings are voluminous and much evidence was offered by both sides.  The contentions of the parties in the pleadings and the evidence, so far as is necessary for an understanding of the questions discussed, will be stated in the opinion.

The privileges granted the Cab Company by the Terminal Company, complained of by the plaintiff in error, so far as are pertinent to this discussion, are:  (1) The exclusive control of checking baggage from and to all points in the City of Atlanta from and into the baggage-room of the terminal station.  (2) The exclusive privilege of having an office in the depot building from which to conduct business.  (3) The exclusive privilege of soliciting business on the depot property and in the depot building from passengers.  (4) The exclusive privilege of boarding the cars of the several railroad companies entering the passenger station, for the purpose of soliciting the delivery in the city of incoming baggage.  (5) The exclusive privilege of receiving from the Terminal Company railroad checks and checking baggage at hotels and residences of passengers, when tickets or evidences of the right to travel are exhibited to it.  (6) The exclusive right to rent and occupy for the purpose of delivery and storage of baggage of incoming passengers for delivery in the City of Atlanta, and of outgoing passengers, prior to the checking of such baggage with railroad checks.  Each of these privileges is granted exclusively to the Cab Company and denied to all others.

Prior to the decision rendered by this court on May 24, 1906, in the case of *Atlanta Terminal Company* v. *American Baggage Company,* 125 *Ga.* 677, each of these privileges was granted to and enjoyed by the Cab Company, except the last.  After the rendition of that opinion, the Terminal Company cut off one corner of its baggage-room by an iron railing about three feet high, and furnished the same to the Cab Company in which to store outgoing baggage prior to the checking of the same by railroad checks.  This space so cut off opens on the driveway from which trunks and other baggage are delivered into the baggage-room, and also has openings into the remaining portion of the baggage-room, which space the Cab Company was occupying at the time this suit was

filed. The terminal company, after this arrangement was made, discontinued privilege (1) supra, and refused to receive into that portion of the baggage-room not rented to the Cab Company any trunk or parcel until the same was accompanied by a railroad ticket or other evidence of right to. travel on one of the railroads using the station. In other words, the Terminal Company discontinued the claim-check system which up to that time had been used exclusively by the Cab Company. The Terminal Company also, after the rendition of said opinion, denied to the Cab Company privilege (5). With these changes, the business of receiving and discharging baggage when this suit was filed was the same as it was when the case in 125 *Ga.* supra, was decided. It is insisted by the plaintiff that each of these exclusive privileges granted the cab company is illegal and should be so declared.

1-4. The case of *Kates* v. *Atlanta Baggage and Cab Company,* 107 *Ga.* 636, decides adversely to the contentions of the plaintiff in error as respects the right to grant to the Cab Company the exclusive privilege of having an office in the depot building for the transaction of its business, of boarding the cars of the several railroad companies prior to entering the station for the purpose of soliciting the delivery in the city of incoming baggage, of soliciting business on the depot property and in the depot building, of checking to point of destination, with railroad checks, the baggage of passengers at hotels and residences.

The plaintiff in error asks that the *Kates* case be reviewed and overruled. The judgment in that case was concurred in by a full bench of six Justices. In order to overrule it, the judgment of reversal must be concurred in by a full bench of six Justices. Upon a review of the *Kates* case a sufficient number of Justices do not concur in order to overrule and reverse it. Therefore that decision must stand and be followed as to all questions decided by it. In view whereof, it is not deemed advisable, in this connection, to enter upon a discussion of the principles underlying the decision. The subject is treated in Beale & Wyman's Railroad Rate Regulation, §§ 809-816, where the authorities pro and con are collated. An inspection of the opinion in the *Kates* case will reveal that art. 4, sec. 2, par. 4 (Civil Code, § 5800), was considered by the court and the decision rendered with reference thereto. It is insisted by plaintiff in error that the right of the

Terminal Company to rent to the Cab Company space in the baggage-room, to be exclusively occupied by it for the storage of trunks prior to offering them to the baggage-master to be checked with railroad checks for transportation, was not decided in the *Kates* case; the defendants insist to the contrary. In order to pass upon this contention it becomes necessary to critically examine the *Kates* case in order to determine if the contention of defendants in error is correct; for if they be correct in this contention, the *Kates* case is controlling, as has been shown above. The facts upon which the opinion in the *Kates* case is based are stated in the opinion. The first sentence shows this. "The facts necessary for a clear comprehension of the merits of the petition, under which the defendants were sought to be enjoined, may be briefly stated as follows." It will not be seriously contended that the legal principles announced arose out of or would be applicable to a different state of facts than those stated by the court, upon which the opinion is based, even though an examination of the record should reveal a material difference. On page 642 Judge Little states the questions for determination by the court this way: "The evidence was in direct conflict on many points. As to the truth of the allegations about which the evidence is conflicting, it is, so far as we are concerned, settled by the determination of the judge, and the right of the petitioner to have the judgment refusing the injunction reversed must depend on the application of legal principles to such of the allegations as are not contested by the evidence, and these are: First, that the defendants permit the Cab Company to enter the passenger-trains before reaching the city, for the purpose of soliciting baggage, and refuse the same privileges to petitioner. Second, that the servants of the Cab Company are allowed access to the passenger station for the purpose of soliciting patronage and for more conveniently attending to its business, and this privilege is refused to petitioner. Third, that the privilege of using an office in the baggage-room of the defendants for the transaction of its business is granted to the Cab Company and refused to Kates. Fourth, the privilege of checking the baggage of prospective passengers at hotels and residences in advance of delivery of baggage at the passenger station." These questions were decided against the contentions of Kates.

Kates also claimed in his petition (page 638, top) that the Cab Company was "given the exclusive privilege of entering the depot building for the purpose of handling trunks and baggage and of issuing what is known as claim-checks, that is to say, that company is allowed to deliver, at his home or elsewhere, to a prospective passenger, its check for his trunk, and on delivery of a trunk so checked, at the baggage-room, it is received by the baggage-master and held until the check is presented." And on same page (middle) the cab company "is allowed storage in the baggage-room, for the baggage of its customers, hours in advance of the departure of outgoing trains, and transacts its business in the baggage-room." These allegations were denied by the answer (page 639 near bottom). "Defendants answered, admitting that a contract existed with the cab company, but averring that no exclusive privilege of entering the depot for the purpose of hauling trunks, baggage, etc., has been given to the cab company; that the same rights which are accorded to the Cab Company as to the receipt and delivery of baggage are extended to all companies and persons engaged in the business, including the petitioner; *that the petitioner as well as the cab company is permitted by the board of control to give claim checks to its patrons, which the baggage-master recognizes.*" It is true that on page 641 the judge further states, "As a part of his evidence the petitioner introduced a contract . . by which it was provided that [the Cab Company] should have the exclusive control of checking baggage from all parts of the City of Atlanta into and from the baggage-room of the depot;" but notwithstanding this the judge treated the existence of the "claim-check" system to have been in issue between the parties, as will appear from this extract from the opinion on page 645, near middle: "Receiving and discharging baggage is one of the duties of a public passenger-carrier, and the obligations before enumerated apply in full force in the receipt and discharge of baggage at the union passenger-station in the City of Atlanta; and if it should be found to be true that the defendant railroad companies, either in the receipt or delivery of baggage by their baggage-master or other agents, discriminated against any passenger or the agent of any passenger in the time or manner in which baggage was received or discharged either through a system of claim-checks or otherwise, such discrimination would be a palpable violation of their

public duties, for which the law affords ample remedy by injunction and full redress in the nature of damages."

It is urged by the counsel for the cab company in this case that the court in this extract was speaking of baggage in its technical sense, having in mind a trunk the custody and possession of which, by reason of its owner's relation to the railroad, could at once be legally enforced upon it; that is, when presented with a railroad ticket, to be checked to point of destination. The court, however, could not have had this view of the matter, for the simple reason that Kates was not complaining that there was a refusal to check with railroad checks trunks when presented with the evidence of the right of transportation; his complaint in this respect was that the baggage-master *received into the baggage-room* trunks having on them claim checks of the cab company, and refused him the same privilege. Nor could the court have had in view the complaint of Kates as to checking baggage by the cab company with railroad checks at hotels and residences, because the opinion deals with this subject and upholds this special privilege thus given to the cab company as being legal. It hardly seems possible to escape the conclusion that the court had in mind the system of claim-checks as practiced at the station, and of which Kates was complaining. It was not the system of claim-checks in and of itself which Kates objected to. He had the perfect right to have a system of his own, just as the cab company had; but the trouble was, as claimed by Kates, that the baggage-master recognized the system of the cab company, and *received the trunks into the baggage-room,* but refused to recognize those upon trunks handled by Kates. The court says that "if it should be found to be true," (that is, as the writer interprets the meaning of the court, if the jury on the final trial of the case should find it to be true that the baggage-master received trunks into the baggage-room on the claim-checks of the cab company and refused a like privilege to trunks handled by Kates, the parties being at issue on this question) "that the defendant railroad companies, either in the receipt or delivery of baggage by their baggage-master or other agents, discriminated against any passenger or the agent of any passenger in the time or manner in which baggage was received or discharged either through a system of claim-checks or otherwise, such discrimination would be a palpable violation of their public duties,"

etc. It is clear that if the court did not decide the system of claim-checks, practiced as claimed by Kates, to be a palpable violation of the public duties of the railroads, it certainly was not decided to be legal, and is still an open question, so far as the *Kates* case is concerned.

The only right of storage allowed the cab company in the baggage-room was to place the trunks handled by it along with and among the other trunks in the baggage-room, this right of storage being exercised under the claim-check privilege. It is certain, so far as storage privileges were concerned, that the cab company had no separate space set apart to it for that purpose. The conclusion follows that in point of fact the cab company had no right of storage in the baggage-room except that allowed by the claim-check privilege, which, being a matter about which there was conflicting evidence, was not decided, and the opinion so expressly states. "The right of the petitioner to have the judgment refusing the injunction reversed must depend on the application of legal principles to such of the allegations as are not contested by the evidence" (page 642). One of the contentions by Kates was that the cab company had the privilege of using an office in the baggage-room for the transaction of its business, and this right was denied to him. There was no conflict in the evidence, nor denial in the pleadings, as to the truth of this contention by Kates. Whatever business may have been transacted in this office by the cab company, it is certain that the storage of trunks was not a part of such business. The original record in the case indicates that the office was used in connection with incoming baggage. In par. 15 of its answer the board of control says: "Therefore it is necessarily true, that, in order to do this work effectively, some arrangement had to be made with some company granting to it the privilege of meeting incoming trains for the purpose of receipting for baggage to be delivered to the passenger's residence. *In order to do this the defendant had to furnish the company thus engaged with an office in which business could be conducted.*" Kates attacked the right of office privileges and the right of storage privileges separately; and it is a significant fact that the court treated these subjects under separate heads, sanctioning the office privilege as legal, and, if not condemning, certainly refusing to pass on the legality of the storage privilege, because its existence

as an exclusive privilege was in issue. It would be fair to say, that, in view of the foregoing, the office privilege was an incident to the exclusive privileges sanctioned by the court, and its use was to enable the cab company to enjoy these privileges, and to that extent it was legal.

It is insisted, however, that the right of the cab company to have an office in the baggage-room from which to conduct its business was distinctly decided; and that there is no difference, in principle, in the right to an office in the baggage-room and the right of storage space; that, the *right of rental* being conceded, the right of use for all purposes follows. In this connection it would be well to determine what principle the *Kates* case decides. It will not be controverted that the exclusive privileges held by the court to be legal, which were granted the cab company and denied to Kates, are all based upon the same legal principles. They are all stated together and one line of argument applies to all. The court on page 643 of the opinion says: "The merit of his [Kates's] complaint, if any exists, must be found in the fact of the refusal of the defendant to grant to him the opportunities so to serve the public and thereby better his business. Whether the refusal so to do is proper or unlawful *does not depend upon the favor or inclination of the railroad company, but upon the plaintiff's right.*" In order for Kates, therefore, to show that he was entitled to an office in the depot building, he had to show that he had a legal right, under the facts, to compel the railroads to grant it to him. The court further says that "if it should depend upon favor, then the plaintiff in error has no cause of complaint, because favor is essentially free and voluntary, and may not be demanded; and it is in this view we come to measure by the legal standard what are the rights of the petitioner under the allegations he makes, as against the rights of the defendants to control property to which they have title and consequently the right of use; and the plaintiff in error [Kates], to succeed, must establish the proposition that the defendants as common carriers are in law bound to afford to him the same conveniences and facilities for carrying on his business which they afford to others engaged in the same calling." The court then proceeds to argue that Kates, seeking to ply his private business upon the railroads' property, has no rights which he can enforce. The decision is predicated upon the proposition that

the railroad companies have the right to exclude from their premises persons going thereon for the purpose of transacting private business; that, as to this class, the property of such companies is private property, and they therefore have the right to grant privileges to one and deny them to others; citing the case of *Fluker* v. *Railroad Co.*, 81 *Ga.* 461. From the foregoing it seems to be clear: (*a*) That as a matter of fact the cab company had no separate space in the baggage-room for storage purposes; it had an office in the baggage-room, but baggage was not stored in the office. It had *no storage privilege in the baggage-room* which was held to be legal by the court, the claim-check privilege being in dispute. (*b*) That the court decided, on legal principles, (1) that as to Kates, seeking to ply his private business, he had no right to enjoin the railroad companies from granting the special privileges to the cab company until like privileges were granted to him; (2) that, except as to duties as passenger carriers which they owed the public, their property was private property. The court never decided, nor was the question in the case, that Kates could, in the suit, assert the rights of passengers, or the rights of prospective passengers. Under the decision of this court in the case of *Atlanta Terminal Company* v. *American Transfer Co.*, 125 *Ga.* 677, the rights of passengers or of prospective passengers can not be enforced by a person or corporation seeking only to carry on private business. The conclusion follows that this court is not concluded by the *Kates* case, in so far as the point is made in the case at bar as to whether the Terminal Company can legally contract with the cab company to grant exclusively to the cab company space in its baggage-room for the storage of outgoing baggage of its patrons, prior to checking the same with railroad checks, and refuse to receive into the baggage-room the trunks of all other persons until presented with railroad tickets or evidence of the right to be transported over one of the lines of railroad using the station. If the language in the fourth headnote in the *Kates* case be susceptible of a broader construction, it should be construed and limited by the legal principles underlying the decision and by the questions really made and decided. The rights of that portion of the public having business with the railroads could not be enforced or their wrongs redressed by *Kates,* and such rights were not involved in that case, and hence could not have been decided.

The defendants in error deny that the claim-check system was in force when this suit was filed, and the evidence in support of this contention is not contradicted. There was no evidence of any intention to renew this system. Therefore the judge committed no error in refusing to enjoin this practice. While this is true, the system will be considered along with the storage privilege, as the same legal principles are applicable to both. Enquiry will therefore be had as to these matters: (*a*) whether the system of "claim-checks" as practiced before the rendition of the opinion in the *Atlanta Terminal Co.* case (125 *Ga.* 677), was or was not in violation of law; and (*b*) whether the exclusive occupancy of a portion of the baggage-room in the terminal station by the cab company, after the rendition of that opinion, as shown by the pleadings and evidence, is or is not in violation of law. For convenience these two questions will be discussed together. The claim-check system is not of itself unlawful. Any person or corporation engaged in the business of hauling trunks or parcels to or from the passenger station can establish this system in conducting its business. The "claim-check" is used simply as a convenient method of identifying the parcel. The operation of this system by the cab company is stated by the plaintiff and admitted by defendant to be as follows: The proposed passenger calls for the cab company to transfer his trunk from his home or hotel to the station. The cab company sends its wagon to the home or hotel, and there receives the trunk, placing one of its checks on the trunk, bearing a given number and giving to the proposed passenger a duplicate check carrying the same number. The trunk is then conveyed by the cab company's wagon to the baggage-room of the Terminal Company. The baggage-master receives the trunk into the baggage-room, bearing the check of the cab company. The passenger follows the trunk at whatever time suits his convenience, purchases his railroad ticket, presents this to an employee of the Terminal Company at the baggage-room, accompanied by the claim-check issued by the cab company, and receives a railroad check for his trunk, nothing further being required of him in identifying his trunk or otherwise. The Terminal Company has granted the cab company the exclusive privilege of this use of claim-checks. It refuses to receive into its baggage-room at all any trunk offered by any other transfer company or per-

son, whether accompanied by a claim-check or not, unless it be accompanied by a railroad ticket or evidence of the right to be transported as a passenger over one of the lines of railroad using the terminal station. If the proposed passenger transports his trunk in person and it is presented to the baggage-master, the privilege of depositing the trunk in the baggage-room is denied him unless he presents with the trunk a railroad ticket. If he should carry his trunk to the baggage-room before he buys his ticket, he would be compelled to leave his trunk unprotected in the driveway or make other disposition of it while he went to the ticket-office, some distance away in another part of the building, to purchase a ticket. The driveway for the delivery of trunks into the baggage-room is on the north side of the building and is the only way provided by which baggage is received or delivered. It is an open way and unprotected. If the trunk should be presented by any other transfer company, or person other than the owner, admission in the baggage-room is refused, if the proposed passenger has not seen proper to buy his railroad ticket and intrust it with such transfer company or person, or if such proposed passenger does not himself appear in person, identify his baggage, and present his railroad ticket. If when such trunk had arrived at the baggage-room the proposed passenger had not arrived, the trunk would have to be cared for by the person in charge of it, exposed to the weather, until the owner should appear with his transportation and identify the trunk. Neither the railroad companies nor their agent, the Terminal Company, have provided any place whatever for the deposit of baggage or for its temporary storage. A rule had been promulgated and enforced that no trunks or other parcels intended to be transported on the railroad as baggage should be received into the baggage-room under any circumstances, except those bearing the cab company's checks, unless the same were accompanied by railroad tickets, and when thus presented would be checked as baggage. Such, in brief, was the method of doing business as respects the receipt of trunks at the baggage-room at the time the decision in the *Atlanta Terminal Company* case, supra, was rendered. Shortly after the decision in that case, and before this suit was filed, a rule was made that no trunk or other parcel whatever would under any circumstances be received in the baggage-room unless accompanied by railroad

tickets, the right of the cab company to deliver the trunks of its patrons being thereby revoked. In lieu of this privilege thus denied the cab company, the Terminal Company allowed the cab company to occupy a part of the baggage-room itself, which space opened on the driveway and also opened into the balance of the baggage-room not rented. Into this space the cab company delivered the trunks of its patrons, where they remained until the proposed passenger appeared and bought his railroad ticket. He then took his railroad ticket and his claim-check and presented it in the depot building to the agent of the cab company, this office being, not in the baggage-room, but on the passage leading from the ticket office to the train-shed. When thus presented, such agent of the cab company would take the ticket and claim-check and go a short distance to the space in the baggage-room occupied by the cab company, where the trunk was identified by the claim-check and tendered to the baggage-master, who received it and gave a railroad check. This check was handed the passenger by the agent of the cab company, who could then proceed on his journey without any further trouble or inconvenience. These privileges of having an office in the depot building and of renting space in the baggage-room or elsewhere from the terminal company were exclusively enjoyed by the cab company. All other persons, whether tendering baggage in person, or through the medium of other transfer companies or draymen, desiring to have baggage checked, were compelled to tender railroad tickets simultaneously with the baggage before their trunks were received in the baggage-room, in the same way and manner as when the claim-check system was in force.

The plaintiff insisted, that the claim-check system was discontinued because of the decision in the *Atlanta Terminal Company* case (supra), and that the claim that exclusive space was rented to the cab company was only a subterfuge to avoid the ruling in that case and thus continue the same discrimination against the public as practiced by the claim-check system; that the inconvenience to the general public in procuring railroad checks for baggage was greater since the change than before; that when the change was made the space which had been, up to that time, used for incoming baggage was used for outgoing baggage and vice versa, and the distance the passenger would have to walk to procure his

baggage checked was greater than it was before, while the patrons of the cab company had no further to walk than before, the cab company's office being on the way to the train-shed. The defendant denied that any such motive prompted the change; and claimed, that the terminal company, as agent of the railroads, owed no public duty to any person in respect to checking baggage until such person had obtained the right to travel by the purchase of a railroad ticket; that when such evidence of the relation of passenger and carrier had been established, everybody was treated alike; that the facilities for serving the public were ample; that space in the baggage-room not necessary for this purpose was not impressed with any public use and was private property, and that it had the right to rent it to the cab company if it chose to do so. For similar reasons the terminal company insisted that the claim-check system was legal.

Mr. Justice Little in the *Kates* case, 107 *Ga.* 645, says: "It is a sound legal principle that a railway company as a common carrier can not grant to any person or persons, or to any part of the public, rights or privileges which it refuses to others, but must treat all alike. Receiving and discharging baggage is one of the duties of a public passenger carrier." It being the duty of a carrier as such to receive the baggage of those who desire to travel upon its lines, it is its duty also to provide suitable and convenient facilities for the reception thereof. Such facilities as it prepares must be furnished without discrimination to all alike who desire to avail themselves of the use of such facilities. This is a public duty. It is not granted as a favor, but may be demanded as a right. The right to have baggage transported by a common carrier is incidental to the right of the owner thereof to be transported: incidental in the sense that no right to have baggage transported arises unless the owner thereof procures the right of transportation for himself. The price paid for a railroad ticket is the consideration for the right of transportation of both person and baggage, and is equally obligatory upon the carrier. The price paid for the ticket pays for the transportation of the baggage in the same way that it pays for the transportation of the person. 3 A. & E. Enc. Law, 543; Hutch. Car. (ed. 1906) § 1241; 6 Cyc. 663. A railway company has the right to make and enforce reasonable rules for the conduct of its business. A rule requiring the purchase of a ticket

before a parcel is checked for transportation as baggage is a reasonable rule, and a rule requiring that the ticket be exhibited to the proper agent before such checking is done is a reasonable one. It does not follow, however, that, until the relation of passenger and carrier is established by the purchase of a ticket, the railway company owes no public duty to the person desiring to become a passenger. The railway company owes to the person desiring to become a passenger the duty to afford him all *necessary and convenient facilities for entering into contractual relations with it.* It is the duty of such company, when such rules as above indicated are made, where the only way provided for entering trains by both passengers and baggage is through a depot provided for such purpose, to furnish suitable waiting-rooms for the comfort and convenience of passengers after the purchase of tickets, and of prospective passengers before purchase of tickets, to provide suitable and convenient offices where tickets can be purchased, and to provide suitable baggage-rooms for the reception of trunks and parcels to be checked for transportation. The person desiring to become a passenger has the right to *demand* the use of these facilities for the purpose of entering into contractual relations with the carrier, for a reasonable time preceding the actual consummation of the contract of carriage. These, being public duties, must be performed by the carrier for every person desiring to use such facilities, with *fairness* and *impartiality* and without any discrimination whatever. As to these duties the property of the carrier is impressed with a public use, and no exclusive privilege can be granted by the carrier to any corporation or person in the enjoyment of them or any of them. It is private property only as between the carrier and those of the general public who have no occasion to use it for purposes of transportation. Donovan *v.* Penn. Co., 199 U. S. 279. It is well settled that no hackman can be prevented from driving to the carrier's depot when his hack contains a prospective passenger; because in respect to prospective passengers, as well as in respect to those who have perfected the contract of carriage, such property is impressed with a public use. "A passenger upon arriving at the station, in whatever vehicle, is entitled to have such facilities for entering the company's depot as may be necessary." Donovan's case, supra, page 296. He has the right to enter the depot; he has the right to sit in the waiting-

room prior to the purchase of a ticket; he has the right, in common with the general public, to the use of any and all facilities provided as preliminary to entering into the actual contract of carriage. The rights he may demand for himself he may demand for such parcels as under the law he has the right to have transported by the carrier as baggage. If a prospective passenger carries his trunk on his shoulder, or in his own private dray, intending presently to enter into contractual relations with the carrier, and presents the same to the baggage-master, it is the duty of the baggage-master to receive it into the baggage-room as a parcel to be subsequently checked as baggage proper. Thus presenting a trunk is notice to the carrier that such person intends in a reasonable time to perfect a contract with the carrier whereby the trunk will be checked as baggage for transportation; or if the prospective passenger sends his trunk by his servant or by a transfer company, the same duty would arise upon the part of the carrier, and the presentation of such parcel would be notice to the carrier that the owner would appear in a reasonable time and demand that the parcel be checked for transportation. It would be but the first step in using the facilities of the carrier to enter into contractual relations with it for the transportation of himself and baggage. The carrier would have the right to prescribe and enforce such rules as would be reasonable, taking into consideration the custom prevailing among the traveling public, as to how long before the departure of trains such parcels could be thus delivered, in order that congestion in the baggage-rooms could be prevented; to provide for the identification of such parcels when railroad checks should be subsequently demanded, and for storage charges similar to those prevailing when incoming baggage is not called for in a reasonable time. This being one of the public duties of the carrier arising from the use of property impressed with a public use, it is a privilege which any person desiring to contract with the carrier has the right to enjoy. It follows that the "claim-check" system, the use of which was granted exclusively to the cab company and denied to everybody else, is a palpable violation of a public duty, the vice in the system as practiced being the reception into the baggage-room of the trunks of its patrons prior to the appearance of the owners with railroad tickets, and denying this right to all other persons. The foregoing applies with equal force to the space occupied by the

cab company in the baggage-room of the terminal company.  Instead of receiving the trunks hauled by the cab company into the baggage-room along with other trunks, one corner of the baggage-room is set apart to the cab company's exclusive use, and the trunks hauled by it received into this space.  The effect is the .same.  A passenger carrier can not thus prefer the cab company in the discharge of a duty it owes to all alike.  In the *Terminal Company* case, supra, the majority of the court, if they did not decide that the claim-check system as practiced was illegal, at least broadly intimated that it was so.  If the claim-check system as practiced be illegal, it is difficult to perceive how the right of storage, as practiced, would be legal.  In the case at bar the suit is brought on behalf of passengers and prospective passengers; on behalf of that portion of the public who do not depend on the favor of the transportation companies, but who may demand, as a matter of right, equal and impartial treatment.  The facilities and conveniences enjoyed by that portion of the public patronizing the cab company, in receiving, storing, and checking baggage, and denied to others, is an unjust discrimination and a violation of the public duties of the railroad companies, whether practiced directly by them or through their chosen agent, the terminal company, whether by means of a claim-check system or by renting exclusive space in the baggage-room.  *The means by which the discrimination is brought about is not material; it is the discrimination itself that is obnoxious.*  A common carrier, holding himself out to the public as such, is bound to receive all goods and passengers offered that he is able and accustomed to carry, upon compliance with such reasonable regulations as he may adopt for his own safety and the benefit of the public.  Civil Code, §2298.

It is insisted in this case that the carrier has adopted a rule, which the agent, the terminal company, is bound to obey, to the effect that no parcel shall be received into the baggage-room unless the same be accompanied by a railroad ticket; that this rule is adopted for its own safety, as well as for the benefit of the public.  It is conceded that a rule is reasonable which provides that no parcel shall be checked with a railroad check for transportation before the presentation of a railroad ticket, but it does not follow, because this regulation is reasonable and is for the protection of the carrier, that a regulation refusing admission into the baggage-room of

any parcel whatever until the transportation is provided would be a reasonable rule either for the protection of the carrier or for the public interest. From a consideration of the method of checking baggage for transportation at the terminal station by that portion of the public not patronizing the cab company, it is evident that such a rule is not in the interest of the public. Nor is such a rule necessary for the carrier's protection. The argument is stressed that the public would impose upon the railroad and have trunks and other parcels transported when the owner was not a passenger. This could not arise, because, after the package is received in the baggage-room, it can not be checked for transportation until the railroad ticket is presented. If not checked for transportation, then the terminal company can collect storage. No reason has been suggested which sustains such a rule being reasonable. See 6 Cyc. 670; Coffee v. L. & N. R. Co., 76 Miss. 569.

5. The defendants make the point by demurrer that the suit is brought in the name of the attorney-general and not in the name of the State; that the attorney-general has no authority to maintain the suit in his name. The suit is brought in the following language: "John C. Hart, as attorney-general of the State of Georgia, in its behalf and by virtue of the authority vested by law in said office, and by an executive order made May—, 1906, avers as follows:" Par. 39 of the petition: "This suit is instituted by virtue of an executive order made by Honorable Joseph M. Terrell, Governor of Georgia, and on the——day of May, 1906, in pursuance of his authority as the chief executive of the State of Georgia, and in pursuance of the authority vested in Hon. John C. Hart, as the attorney-general of the State of Georgia." The executive order referred to is as follows: "After reading the foregoing petition, it is directed that the attorney-general file appropriate proceedings in the proper courts, in the name of the State, to correct the wrongs to the people complained of." It is urged that this is not the suit of the State, but the suit of the attorney-general; that the only suit that could be brought was in the name of the State by the attorney-general. Atkinson v. Cawley, 112 Ga. 485, is relied on as authority for this position. In that case the suit was brought by "W. Y. Atkinson, Governor of the State of Georgia, suing for the use of B. S. Calhoun." The court says that this was an effort to bring a suit on behalf of the State under

authority of the Governor. If the petition had been in the name of the State of Georgia by and through W. Y. Atkinson, Governor, there would be no doubt that the State would be a party to the case. The Governor had no authority to sue in his own name as an individual or in his official capacity as Governor for the use of a private citizen, for the simple reason that no cause of action existed in him as an individual or in his official capacity as Governor, and he has no authority to bring such a suit on behalf of an individual interested in the subject-matter of the suit. The court says: "The words, 'suing for the use of B. S. Calhoun,' which follow the words 'governor,' etc., indicate that the suit is brought for the benefit of Calhoun; and as the nominal plaintiff is not the State but simply W. Y. Atkinson, who neither as an individual nor as a governor has any authority to bring the action, B. S. Calhoun is to be treated as the real plaintiff in the case. In no view of the matter can the petition be construed as one brought by the State." We apprehend, however, that if the suit had been brought by W. Y. Atkinson as Governor who sues for and on behalf of the State, the court would have held that the State was the real party, and that on demurrer the petition could have been amended. So we think in this case. The attorney-general, in his official capacity, had the undoubted authority to bring the suit. The declaration shows that he claims no personal interest in it. If he had sued in the name of the State by and through John C. Hart, attorney-general, the State undoubtedly would have been a party. The suit of John C. Hart, as attorney-general of the State and in its behalf and by authority of an executive order, is substantially a suit by the State. In the case of *Dent* v. *Merriam,* 113 *Ga.* 83, the court says: "The strict rules of pleading would have required that this suit be brought by Amy Merriam by her next friend, Tamah Dent, instead of by Tamah Dent as next friend of Amy Merriam. This court, however, has frequently held, in exactly similar cases, that such an irregularity is immaterial and will not effect the decision of the case. 'The more regular form of pleading is for the minor to sue by the next friend, but if the next friend sue as next friend to the minor, it is the same thing in substance.' *Lasseter* v. *Simpson,* 78 *Ga.* 61; *Van Pelt* v. *R. R. Co.,* 89 *Ga.* 706; *Ellington* v. *Beaver Dam Co.,* 93 *Ga.* 55." In the case of *Van Pelt* v. *R. R. Co.,* supra, the first headnote is as follows: "Though

in suits conducted by a next friend the minor ought regularly to sue by him, yet if the next friend sue in behalf of the minor, it is the same in substance. The defect is amendable by alleging that the minors sue by next friend." So we hold that the suit as brought is substantially the suit of the State, but that strictly good pleading would require that it should have been in the name of the State by and through John C. Hart as attorney-general. This defect is curable by amendment which the plaintiff can make in the court below.

6. The defendant insists by demurrer that if any right of action exists under the pleadings and evidence in the case, mandamus and not injunction is the remedy. An injunction can only restrain; it can not compel a party to perform an act. It may restrain until performance. Civil Code, §4922. In the case of *Goodrich* v. *Georgia Railroad Co.*, 115 *Ga.* 340, Mr. Justice Cobb for the court reviews the authorities interpreting the above section of the code. These principles are deduced therefrom: (*a*) If the main purpose of the petition is to compel the performance of an act, then, under our code, injunction can not be used as a remedy to accomplish this purpose. Under our code injunction can be used only to restrain. (*b*) While the court can not issue a purely mandatory order, the court can grant an injunction the essential nature of which is to restrain, although in yielding obedience to the restraint the defendant may be incidentally required to perform some act. The cases of *Georgia Pacific Ry. Co.* v. *Douglasville*, 75 *Ga.* 828, *Russell* v. *Mohr-Weil Lumber Co.*, 102 *Ga.* 563, *Vaughn* v. *Yawn*, 103 *Ga.* 577, and *Paschal* v. *Tillman*, 105 *Ga.* 494, are cited and distinguished, holding that in each of these cases the order complained of, if carried into effect, would have required the party against whom it was issued to perform some affirmative act which was the main and controlling purpose of the order. In the case at bar, as made by the petition, brought by the State for the benefit of the public, injunction is an appropriate remedy, and the exclusive remedy was not by writ of mandamus. See, in this connection, *Trust Company* v. *Georgia*, 109 *Ga.* 747.

For reasons stated in the foregoing discussion, the writer is of the opinion that the judge below should have enjoined the defendants from carrying out the contract with the cab company, renting to it exclusively space in the baggage-room, on the ground that it

is an illegal discrimination against the public, and is violative of art. 4, sec. 2, par. 4, of the constitution. The opinion of the majority being as expressed in the headnotes, the judgment of the court below will be

*Affirmed. Five Justices concur. Freeman, J., dissents.*

ATKINSON, J., specially concurring. In my opinion the right of the defendant to rent space in its baggage-room to another for the purpose of enabling the tenant to carry on therein the business of storing trunks and other parcels preparatory to checking them as baggage rests upon the same principle as the right of the defendant to grant to another the exclusive use of the "claim-check system." Concerning that question my views are fully expressed in the report of the case of *Atlanta Terminal Company* v. *American Baggage Co.,* 125 *Ga.* 677. In the present case there is a slight conflict of evidence as to whether there was not a discrimination in favor of the Atlanta Baggage & Cab Company in the matter of checking trunks as baggage after passenger relations had been established by purchasers of tickets. For example, the evidence offered generally by the defendant tended to show that there was no such discrimination, while the testimony of Mrs. Robertson indicates that after the purchase of a ticket by one not a patron of said Atlanta Baggage & Cab Company, the purchaser of the ticket was not then afforded an equal opportunity with patrons of the Atlanta Baggage & Cab Company for identifying and checking trunks. It may be that the example cited was illustrative of a general custom of discrimination after the passenger relation had been established. As to whether it was or not, and, if so, whether in fact the complaint was well founded, presented questions of fact for determination by the chancellor. Aside from these questions, I do not see from the evidence any other question of fact involved in the case. The other questions are purely of law and are such as to enable me to agree with the majority in the conclusion that the court did not commit error by refusing to grant the injunction.