## S03A1154. PERDUE et al. v. BAKER.
### (586 SE2d 606)

FLETCHER, Chief Justice.

Governor Sonny Perdue filed a petition for writ of mandamus seeking to compel Attorney General Thurbert Baker to dismiss an appeal filed on behalf of the State of Georgia in a case involving legislative reapportionment under the Voting Rights Act. The trial court denied the Governor's petition, ruling that the Attorney General had exclusive authority to decide whether to continue the State's efforts to enforce a law enacted by the General Assembly and signed by the Governor. The issue presented here is whether the Attorney General has the authority under state law to appeal a court decision invalidating a state redistricting statute despite the Governor's order to dismiss the appeal. Because there is constitutional authority for the General Assembly to vest the Attorney General with specific duties and a state statute vested the Attorney General with the authority to litigate in the voting rights action, we hold that the Attorney General had the power to seek a final determination on the validity of the State Senate redistricting statute under the federal Voting Rights Act. Therefore, we affirm the trial court's ruling that the Governor had no clear legal right to order the Attorney General to dismiss the appeal filed on behalf of the State of Georgia in the United States Supreme Court.

## PRIOR PROCEEDINGS

Following the 2000 decennial census, the General Assembly enacted a bill that reapportioned State Senate districts and Governor Roy Barnes signed the bill into law as Act 1EX6.[1] The State then filed a civil action in the United States District Court for the District of Columbia seeking preclearance of the Senate redistricting plan under Section 5 of the Voting Rights Act, a prerequisite to enforcing the law.[2] The State sought a declaratory judgment that the plan did not have the purpose or effect of " 'denying or abridging the right to vote on account of race or color' or membership in a language minority group."[3] Denying the State's request for a declaratory judgment, the district court held that the State failed to meet its burden of proof under Section 5 that the State Senate redistricting plan did not have a retrogressive effect on the voting strength of African-American voters in Georgia.[4] It denied preclearance.

The General Assembly enacted a revised Senate redistricting plan, Act 444, and the State submitted the new plan to the district court for preclearance.[5] In June 2002, the three-judge district court approved the revised Senate redistricting plan.[6] Act 444, which was not codified into law, expressly provides that its senatorial districts are contingent and shall take effect only if the original Senate redistricting plan cannot lawfully be implemented under the federal Voting Rights Act.[7] "This Act [444] does not repeal or amend the provisions of the special session Senate redistricting plan [in Act 1EX6]; and those provisions are merely suspended pending a final determination of their enforceability under the federal Voting Rights Act of 1965, as amended."[8] To obtain a final determination, the Attorney General filed a direct appeal in July 2002 to the United States Supreme Court challenging the federal district court's order rejecting the original Senate redistricting plan. The Supreme Court granted review in January 2003.[9]

---

[1] Act No. 1EX6 of Aug. 24, 2001, 2001 Ga. Laws Extra. Sess. 2 (codified at OCGA § 28-2-2 (Supp. 2002)).

[2] See 42 U.S.C.A. § 1973c (West 1994).

[3] See *Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 29 (D.D.C. 2002) (quoting 42 U.S.C. § 1973c), vacated, 539 U. S. 461 (123 SC 2498, 156 LE2d 428) (2003).

[4] See id. at 31 (denying preclearance to State Senate redistricting plan, but granting a declaratory judgment that the U.S. Congressional and State House redistricting plans satisfied federal voting rights requirements).

[5] See *Georgia v. Ashcroft*, 204 F. Supp. 2d 4 (D.D.C. 2002).

[6] See id. at 16.

[7] See Act No. 444 of April 11, 2002, 2002 Ga. Laws 148, 149 (not codified); see also OCGA § 28-2-2 editor's note (Supp. 2002) (explaining the contingent nature of the uncodified act).

[8] 2002 Ga. Laws at 149, § 1 (d).

[9] *Georgia v. Ashcroft*, 537 U. S. 1151 (123 SC 964, 154 LE2d 861) (2003).

Ten days later, soon after being installed into office, Governor Perdue requested that Attorney General Baker dismiss the appeal. The Governor contended that the Georgia Constitution vests his office with the chief executive powers to dismiss an appeal pending in the U.S. Supreme Court when the State of Georgia is the sole-named appellant.[10] The Attorney General disagreed, citing constitutional provisions that vest his office with exclusive authority in all legal matters related to the executive branch in state government.[11] Faced with this refusal, the Governor sought a writ of mandamus to require the Attorney General to dismiss the pending appeal in the Supreme Court. The trial court denied the Governor's petition, and he sought review in this Court.

While this appeal was pending, the Supreme Court issued its opinion in *Georgia v. Ashcroft*.[12] The Court vacated the district court's judgment and remanded the case for the district court to reweigh the facts in light of the Supreme Court's explication of retrogression. The voting rights case is now pending in the district court.

On the same day the Supreme Court issued its decision, the Attorney General moved to dismiss this appeal as moot since the relief that the Governor sought – dismissal of the appeal pending in the United States Supreme Court – had been achieved. We denied the motion for three reasons.[13] First, the underlying voting rights case remains pending in federal court awaiting a final determination. If the Governor has the right to order the Attorney General to cease prosecution of the appeal, then he would have the power to order the Attorney General to cease prosecution of the same claims when they are pending before a trial court. Second, the issue of the Attorney General's authority, duties, and powers is one capable of repetition that has so far evaded review.[14] Third, the case contains an issue of significant public concern concerning the roles of the State's chief executive officer and chief legal officer in litigation involving the State of Georgia.[15]

---

[10] See Constitution of the State of Georgia of 1983 art. V, sec. II, para. I; OCGA § 45-15-35 (2002).

[11] Ga. Const. art. V, sec. III, para. IV; OCGA § 45-15-34.

[12] 539 U. S. 461.

[13] See *Perdue v. Baker*, 276 Ga. 822 (586 SE2d 303) (2003).

[14] See *Bowers v. Board of Regents*, 259 Ga. 221 (378 SE2d 460) (1989) (dismissing as moot case involving the standing of the Attorney General to sue an executive agency to require disclosure of records under Open Records Act); *Coggin v. Davey*, 233 Ga. 407, 409-410 (211 SE2d 708) (1975) (declining to rule on the broad issues concerning the constitutional or statutory powers of the Attorney General to represent members of the General Assembly in connection with their official duties).

[15] See *Hopkins v. Hamby Corp.*, 273 Ga. 19 (538 SE2d 37) (2000) (setting out exceptions to mootness doctrine).

## ALLOCATION OF EXECUTIVE POWERS

1. Both the Governor and Attorney General are elected constitutional officers in the executive branch of state government,[16] which is responsible for enforcing state statutes.[17] The Georgia Constitution provides that the Governor is vested with the chief executive powers.[18] Among those powers is the responsibility to see that the laws are faithfully executed.[19] Other executive officers, including the Attorney General, are vested with the powers prescribed by the constitution and by law.[20] The constitution states that the Attorney General "shall act as the legal advisor of the executive department, shall represent the state in the Supreme Court in all capital felonies and in all civil and criminal cases in any court when required by the Governor, and shall perform such other duties as shall be required by law."[21]

Within the executive branch, both the Governor and Attorney General have statutory authority to direct litigation on behalf of the State of Georgia.[22] Under the State Government Reorganization Act of 1931, which established the Department of Law, the Governor "shall have power to direct the Department of Law, through the Attorney-General as head thereof, to institute and prosecute in the name of the State such matters, proceedings, and litigations as he shall deem to be in the best interest of the people of the State."[23] The Governor also has the power to provide for the defense of any action in which the State has an interest.[24]

OCGA § 45-15-3 sets out the Attorney General's general responsibilities. It repeats his constitutional duties to serve as the executive branch's legal adviser, represent the State in all capital felony appeals, and represent the State in all civil and criminal actions when required by the Governor; it further provides that the Attorney General may give written legal opinions to state departments on request and prepare all state contracts when advisable.[25] Of primary

---

[16] Ga. Const. art. V, sec. I, para. II; Ga. Const. art. V, sec. III, para. I; Ga. Const. art. V, sec. IV, para. I.

[17] See *Adams v. Georgia Dep't of Corrections*, 274 Ga. 461, 462 (553 SE2d 798) (2001).

[18] Ga. Const. art. V, sec. II, para. I.

[19] Ga. Const. art. V, sec. II, para. II.

[20] Ga. Const. art. V, sec. II, para. I; Ga. Const. art. V, sec. III, para. III.

[21] Ga. Const. art. V, sec. III, para. IV.

[22] See OCGA §§ 45-15-3 (4), 45-15-35; see also Robert S. Stubbs, *Powers and Limits of State Government Under Georgia Law* 415 (1980) (describing the Attorney General's role in legal actions involving other state officers, executive departments, and other state bodies).

[23] State Government Reorganization Act of 1931, Act No. 298 of Aug. 27, 1931, 1931 Ga. Laws 7, 39 (current version at OCGA § 45-15-35).

[24] See OCGA §§ 45-12-26, 45-15-6.

[25] See OCGA § 45-15-3 (1)-(5).

relevance in this case are the last two duties specified in the code section. Subsection (6) gives the Attorney General independent authority to represent the State in any civil action without the Governor's request: "It is the duty of the Attorney General . . . [t]o represent the state in all civil actions tried in any court." The final subsection is a catch-all phrase similar to the language in the constitution, giving the Attorney General authority to perform "other services as shall be required of him by law."[26]

Construed together, these constitutional provisions and statutes do not vest either officer with the exclusive power to control legal proceedings involving the State of Georgia. Instead, these provisions suggest that the Governor and Attorney General have concurrent powers over litigation in which the State is a party. Both executive officers are empowered to make certain that state laws are faithfully enforced; both may decide to initiate legal proceedings to protect the State's interests; both may ensure that the State's interests are defended in legal actions; and both may institute investigations of wrongdoing by state agencies and officials.[27] Thus, they share the responsibility to guarantee that the State vigorously asserts and defends its interests in legal proceedings.

A trilogy of decisions from the early twentieth century supports this conclusion that the Governor and Attorney General have joint responsibility to protect the State's interests in litigation. More than a century ago, this Court stated in *Trust Company v. State of Ga.*:[28]

> We are inclined to the opinion that the attorney-general has the power to institute suits necessary to the protection of the interests of the State; in case, for instance, where the State's property is involved, or where public rights are jeopardized, without direction from the Governor; but when directed by the Governor, as in this case, to proceed, he has no discretion in the matter, but should obey the mandates of the chief executive.

Subsequently, we held that when an act is silent about the right of a state board to bring suit, the Governor or Attorney General must decide whether an appeal should be made.[29] The final decision, without referring to the first two cases, states as a controlling principle

---

[26] See OCGA § 45-15-3 (6) & (7).

[27] See OCGA §§ 45-15-17 (giving Attorney General authority to conduct investigations into state affairs), 45-15-18 (giving Governor authority to direct Attorney General to conduct investigations); see also OCGA § 45-15-19 (giving Governor and General Assembly authority to investigate the Attorney General and Department of Law).

[28] 109 Ga. 736, 746-747 (35 SE 323) (1900).

[29] *Woodward v. Westmoreland,* 124 Ga. 529, 532 (52 SE 810) (1905).

that the constitution and statutes prescribe the duties of the Attorney General, thus suggesting that the State's chief legal officer possesses no common law powers.[30] We find that these decisions do not decide the common law powers, if any, of the Attorney General, but instead support the proposition that neither the Governor nor the Attorney General has the exclusive power to decide the State's interest in litigation.

As a result, we reject the broader claim by each officer that he has the ultimate authority to decide what is in the best interest of the people of the State in every lawsuit involving the State of Georgia. By giving both the Governor and Attorney General the responsibility for enforcing state law, the drafters of our constitutions and the General Assembly have made it less likely that the State will fail to forcefully prosecute or defend its interests in a court of law or other legal proceeding. This overlapping responsibility is also consistent with the existing practice in state government. Most important, it provides a system of checks and balances within the executive branch so that no single official has unrestrained power to decide what laws to enforce and when to enforce them.

We also reject the dissent's narrow characterization of the Attorney General's role as merely that of legal counsel to the Governor. To imply that the Georgia Rules of Professional Conduct control the Attorney General's relationship to the Governor ignores the important and independent role assigned to the Attorney General under our constitution. Accepting the dissent's argument would eviscerate the Attorney General's separate constitutional role.

The State of Georgia is not one branch of government, one office, or one officer. The State's authority resides with the people who elect many officers with different responsibilities under valid law.

2. Our conclusion that both officers have the duty to enforce state laws is consistent with the language and legislative history of article V of the 1983 Georgia Constitution. The first paragraph on the Governor's duties and powers in the Executive Article states the following: "The chief executive powers shall be vested in the Governor. The other executive officers shall have such powers as may be prescribed by this Constitution and by law."[31] This provision made two changes from previous constitutions. It added the word "chief" to the first sentence and added the second sentence referring to the

---

[30] See *Walker v. Georgia Ry. & Power Co.*, 146 Ga. 655, 656 (92 SE 57) (1917). But see OCGA § 1-1-10 (c) (1); *Coggin v. Davey*, 233 Ga. at 410 (holding Attorney General may represent legislators in legal actions arising out of their official duties without citing any constitutional or statutory authority in support of that holding).

[31] Ga. Const. art. V, sec. II, para. I.

relationship between the Governor and other executive officers.[32]

The Committee to Revise Articles IV and V intended for this paragraph to explain the allocation of powers within the executive branch of state government. First, the drafters wanted to provide a clear statement that the Governor was the chief executive in relationship to other executive officers, both elected and appointed.[33] This clarification was necessary to address the past assertions of some constitutional officers that as elected officers they were not subject to the Governor's power.[34] Second, the drafters wanted to indicate that the Governor had not only express powers, but also had reserved powers.[35] In other words, the Governor as head of the executive branch possessed those executive powers not expressly granted to other executive officers by the constitution or by law.

Finally, the drafters wanted to ensure that the Governor did not possess unlimited authority over other executive officers. Immediately after granting executive powers to the Governor, the 1983 Constitution places a restraint on those powers: it grants to the other executive officers "such powers as may be prescribed by this Constitution and by law." This provision means that the other constitutionally elected officers possess powers granted to them by the constitution and other laws.[36] Another provision in the Executive Article concerning the "other executive officers" reiterates this point.[37] It provides that the General Assembly shall prescribe the powers and duties of the Attorney General and the five other state elected executive officers, except as otherwise provided in the constitution.[38] Consistent with these provisions, the drafters retained the language from earlier constitutions on the Attorney General's duties. There-

---

[32] See Constitution of the State of Georgia of 1976 art. V, sec. I, para. I (§ 2-2701) (1977) ("The executive power shall be vested in a Governor"); Select Comm. on Constitutional Revision, 1977-1981, Transcripts of Meetings, Comm. to Revise Arts. IV & V, Oct. 15, 1979, at 56.

[33] See Comm. to Revise Arts. IV & V, Oct. 15, 1979, at 56; see also Comm. to Revise Arts. IV & V, Nov. 28, 1979, at 117, 119 ("other executive officers" means "anybody that's working for the state absent those who work for the judiciary or legislature"). See generally *Maddox v. Fortson,* 226 Ga. 71, 77 (172 SE2d 595) (1970) ("There is a reasonable and justifiable difference between the office of Governor and other statehouse elected officers").

[34] See Comm. to Revise Arts. IV & V, Oct. 15, 1979, at 56-57; see also Comm. to Revise Arts. IV & V, Nov. 28, 1979, at 120-121 (noting that the constitution divides the Governor's executive powers three ways: those he alone can do, those he shares with others, and those that others alone can do).

[35] See Comm. to Revise Arts. IV & V, Nov. 28, 1979, at 117-121.

[36] See id.; see also Comm. to Revise Arts. IV & V, Oct. 15, 1979, at 56-57 ("this would clarify the role of the Governor as chief executive in relationship to those Constitutional officers, except as it says here, where those duties are prescribed by law").

[37] See Ga. Const. art. V, sec. III, para. I (listing the "other executive officers" as the Secretary of State, Attorney General, State School Superintendent, Commissioner of Insurance, Commissioner of Agriculture, and Commissioner of Labor).

[38] See Ga. Const. art. V, sec. III, para. III.

fore, the constitution sets out the general powers and duties of the Attorney General, but enables the legislature to assign other duties to that office through the laws that it enacts.

3. To support his claim that "the Governor, and the Governor alone" is authorized to make decisions related to litigation filed in the State's name, the Governor relies on the constitutional provision describing the Attorney General's duties and a section of the 1931 Reorganization Act.[39] The 1983 Constitution, like all the constitutions since 1868, provides that the Attorney General "shall represent the state . . . in all civil and criminal cases in any court when required by the Governor."[40] In addition, OCGA § 45-15-35 vests the Governor with the power to direct the Department of Law to institute and prosecute litigation in the name of the State. The Governor contends that this language means the Attorney General must follow his orders to dismiss or withdraw an appeal in any case regardless of the circumstances.

Contrary to the Governor's contention, we do not read these constitutional or statutory provisions as denying power to the Attorney General in representing the State, but instead interpret them as granting additional power to the Governor. They provide specific authority for the Governor to fulfill his duty to enforce state laws by directing the Attorney General to represent the State and its interests in court and other proceedings when necessary.[41] Although the drafters did decline to add the Attorney General's specific statutory duties to the constitution, they preserved his authority to act under statutes by leaving the language on his duties unchanged from previous constitutions.

Even if we adopted the Governor's view that the constitutional provision and OCGA § 45-15-35 give him the implicit right to order the Attorney General to end litigation on behalf of the State, that interpretation would not resolve the specific dispute in this case. Immediately following the constitutional language on which the Governor relies, the Georgia Constitution provides that the Attorney General "shall perform such other duties as shall be required by law."[42] Under the most restrictive interpretation, the "law" refers to the constitution and statutes of this State.

As a result, we decline to address the Governor's contention, adopted by the dissent, that his express right to initiate litigation

---

[39] See 1931 Ga. Laws at 39, sec. 92 (current version at OCGA § 45-15-35).

[40] See Ga. Const. art. V, sec. III, para. IV.

[41] See *Trust Co.*, 109 Ga. at 746-747. Cf. *Dean v. Bolton*, 235 Ga. 544 (221 SE2d 20) (1975) (Governor requested that Attorney General investigate travel and expense account vouchers of a member of the General Assembly).

[42] See Comm. to Revise Arts. IV & V, Oct. 17, 1979, at 57 (discussing need for Attorney General to function as an independent state officer and not be subservient to the Governor).

always includes the implicit right to end any lawsuit. Rather, the dispositive issue is whether any laws of this State grant the Attorney General independent authority to continue the litigation in this case. To decide whether the Governor's powers as chief executive include the absolute right to direct the Attorney General to dismiss the State's appeal in *Georgia v. Ashcroft*, we look to the powers and duties of the Attorney General as prescribed under the Georgia Constitution and statutory law.

## THE ATTORNEY GENERAL'S DUTIES

4. The Attorney General is a state executive officer elected at the same time and holding office for the same term as the Governor.[43] As an elected state constitutional officer, the Attorney General has the powers prescribed to him by the 1983 Constitution, statutes, and case law.[44] The General Assembly has given the Attorney General specific authority to act independently on behalf of the State in a variety of civil and criminal cases. For example, the code chapter on the Attorney General empowers that officer to represent the State in all capital felony actions before this Court,[45] prosecute any person for violating a criminal statute while dealing with the State,[46] represent the State in all civil actions in any court,[47] file and prosecute civil recovery actions against any person who violates a statute in dealing with the State,[48] represent the state authorities that are instrumentalities of the State,[49] represent the Comptroller General in collecting or securing any state claim,[50] and represent the State before the United States Supreme Court.[51]

In 1975, there were two changes in the law related to the Attorney General's duties that made explicit what had previously been only implicit: the Attorney General has the power to represent the State in civil actions independently of the Governor's direction.[52] First, this Court held in *Coggin v. Davey* that the Attorney General

---

[43] Ga. Const. art. V, sec. III, para. I.

[44] See Ga. Const. art. V, sec. II, para. I.

[45] OCGA § 45-15-3 (5).

[46] OCGA § 45-15-10.

[47] OCGA § 45-15-3 (6).

[48] OCGA § 45-15-12.

[49] OCGA § 45-15-13.

[50] OCGA § 45-15-7.

[51] OCGA § 45-15-9.

[52] See *Maddox v. Fortson*, 226 Ga. at 72 (Attorney General represented Secretary of State in lawsuit filed by Governor challenging provision that prohibited incumbent Governors from being eligible to run for a second consecutive term of office); see also *Thompson v. Talmadge*, 201 Ga. 867 (41 SE2d 883) (1947) (Attorney General represented Lieutenant Governor M.E. Thompson in lawsuit filed by Ellis Arnall, as Governor, against Herman Talmadge, whom the General Assembly had elected as Governor after the death of his father).

was authorized to represent legislators in legal actions arising out of their official duties in the General Assembly.[53] In that case, three radio station employees sued members of the Georgia Senate and House of Representatives seeking a declaration that the Open Meetings Act applied to the General Assembly and its committees. Common Cause intervened and sought to bar the Attorney General from representing the legislators because they, and not the Governor, had requested the representation. The trial court ruled that Ga. Code Ann. § 89-920 (OCGA § 45-15-70) applied, the legislators had failed to request the Governor to appoint counsel as that statute required,[54] and therefore the Attorney General lacked authority to represent the legislators.

On appeal, then Attorney General Arthur Bolton asserted that the trial court erred in holding that he lacked authority to defend legislators "on his own motion."[55] Although this Court declined to address the broader issue of the Attorney General's constitutional or statutory powers, the opinion concluded that the trial court erred in its ruling on the legal representation issue. The Court held that Ga. Code Ann. § 89-920 did not prohibit the Attorney General's representation of legislators in legal actions arising out of their official duties. Because the opinion does not cite any law for its holding, the source of the Attorney General's authority under Georgia law to represent members of the General Assembly is unclear.

Three months later, the General Assembly amended Ga. Code Ann. § 40-1602 (OCGA § 45-15-3) to expressly grant the Attorney General the authority to represent the State in civil actions without any request from the Governor. The 1975 amendment was enacted "to clarify the duties of the Attorney General and the circumstances under which the Attorney General shall act at the direction of the Governor."[56] Prior to the amendment, the caption of § 40-1602 describing the Attorney General's duties was entitled "Duties required by Governor." The first sentence began, "It is the duty of the Attorney General when required so to do by the Governor," and then listed six separate duties of the State's chief legal officer.[57] The 1975 amendment deleted the words "by Governor" from the caption, "when required so to do by the Governor" in the first sentence, and "when

---

[53] See 233 Ga. at 410.

[54] See 1959 Ga. Laws 18, 19.

[55] See *Bond v. Floyd*, 385 U. S. 116 (87 SC 339, 17 LE2d 235) (1966) (Attorney General on his own motion represented members of General Assembly without any request by Governor).

[56] Act No. 576 of April 18, 1975, 1975 Ga. Laws 882; see also Act No. 574 of April 18, 1975, 1975 Ga. Laws 878 (amending § 89-920 discussed in *Coggin v. Davey* "to clarify the circumstances under which the Governor may designate legal counsel for a public officer").

[57] See Ga. Code Ann. § 40-1602 (1957).

required by the Governor" in subparagraph 6.[58] As amended, the statute read:

**40-1602. Duties required**
It is the duty of the Attorney General–

. . . .

6. In other courts.–To represent the State in all civil cases in any court.[59]

Thus, this 1975 amendment resolved, at least in part, the broader issue of the Attorney General's powers that this Court declined to address in *Coggin v. Davey.* The amended code section provides authority for the Attorney General to represent legislators and other state officials "on his own motion" without any request, requirement, or direction from the Governor.[60] We need not decide, however, the full extent of the Attorney General's power to represent the State under this statute or the circumstances, if any, under which the Governor may compel the Attorney General to end his representation. In this case, a more narrowly drawn statute provides authority for the Attorney General to continue the voting rights litigation despite the Governor's order to dismiss the appeal.

## ACT 444

5. The General Assembly is vested with the power to reapportion the State Senate and House Districts.[61] Pursuant to this legislative power, the General Assembly enacted the original Senate redistricting plan in Act 1EX6 and the revised plan in Act 444. Section 1 (b) of Act 444 provides that the original Senate redistricting plan will apply if it "may lawfully be implemented under the federal Voting Rights Act."[62] In the event that the original plan may not be lawfully implemented, section 1 (c) provides that qualifying for the Georgia State Senate shall be conducted according to the revised Senate redistricting plan as described in Act 444. Section 1 (d) states: "This Act does not repeal or amend the provisions of the [original] Senate redistricting plan; and those provisions are merely suspended pending a final determination of their enforceability under the federal

---

[58] See 1975 Ga. Laws at 882.
[59] Ga. Code Ann. § 40-1602 (1975).
[60] See Comm. to Revise Art. VI, Aug. 5, 1977, at 121 (Robert Stubbs) ("the law, the statute, that y'all cleaned up here a couple of years ago was very explicit in that respect. It's not made dependent upon the Governor's action.").
[61] Ga. Const. art. III, sec. II, para. II.
[62] 2002 Ga. Laws 149.

Voting Rights Act of 1965, as amended."[63] Governor Barnes signed the act into law, but it was not codified in the Official Code of Georgia pending resolution of the legality of the original plan.

Act 444 was enacted after the federal district court had denied preclearance to the original Senate redistricting plan, but before the State filed an appeal of that decision to the U. S. Supreme Court. By its terms, Act 444 expresses the legislature's intent that the original redistricting plan for the State Senate should be followed if allowed by federal law. Section 1 (d) states that the original plan's provisions are "suspended" until the State can obtain a final determination on the legality of the original plan under the federal Voting Rights Act. At the time the General Assembly enacted Act 444, the first step in the process for the State to obtain a "final determination" on its ability to enforce the reapportionment plan under the federal Voting Rights Act was to file a direct appeal with the Supreme Court seeking to reverse the district court's opinion. Although the Governor proposes other interpretations of "final determination," no other action by the State would have achieved a decision upholding the validity of the original Senate redistricting plan under the federal Voting Rights Act.

As the State's chief legal officer, the Attorney General is the official charged with representing the State in reapportionment cases.[64] Before any change affecting voting qualifications, standards, practices, and procedures may take effect, the State must obtain preclearance of the change under Section 5 of the Voting Rights Act.[65] One way to obtain preclearance is by instituting a declaratory judgment action in the United States District Court for the District of Columbia.[66] If preclearance is declined, the State's only remedy is to file a direct appeal to the United States Supreme Court. OCGA § 45-15-9 provides that the Attorney General "shall represent the State in all actions before the Supreme Court."

Accordingly, after the three-judge court denied preclearance, the Attorney General appealed to the Supreme Court. By appealing, the Attorney General was fulfilling his general duty as chief legal officer to execute state law and his specific duty to defend the reapportionment law as enacted by the General Assembly.

---

[63] Id.
[64] See, e.g., *Georgia v. United States*, 411 U. S. 526 (93 SC 1702, 36 LE2d 472) (1973).
[65] See 42 U.S.C.A. § 1973c.
[66] See id.

## SEPARATION OF POWERS

6. We next consider whether Act 444 violates the doctrine of separation of powers by directing that it takes effect only after a final determination is made regarding the enforceability of the provisions of Act 1EX6 under the Voting Rights Act. Because Act 444 does not impermissibly encroach on the power of the executive branch to control litigation, but instead is a proper assertion of legislative power to determine reapportionment, we conclude that it does not violate separation of powers.

Although the Georgia Constitution provides expressly for separate executive, legislative, and judicial branches, "this separation is not and from the nature of things can not be total."[67] This Court has previously recognized that "[t]he separation of powers principle is sufficiently flexible to permit practical arrangements in a complex government, and . . . it is not always easy to draw a line between executive functions and legislative functions."[68] The United States Supreme Court has enunciated a similar view of the federal doctrine of separation of powers – "the system of separated powers and checks and balances established in the Constitution was regarded by the Framers as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other . . . [but] we have never held that the Constitution requires that the three branches of Government operate with absolute independence."[69] The Supreme Court noted that the Constitution "enjoins upon its branches separateness but interdependence, autonomy but reciprocity."[70] Because the Supreme Court's exposition of separation of powers is consistent with this Court's prior rulings on the issue, we find federal precedent persuasive in considering the question before us.

A legislative enactment violates separation of powers when it increases legislative powers at the expense of the executive branch,[71] or when the enactment " 'prevent[s] the Executive Branch from accomplishing its constitutionally assigned functions,' "[72] even if it does not increase legislative powers. Thus, this Court must examine the respective roles of the legislative and executive branches and determine whether Act 444 inappropriately intrudes upon executive

---

[67] *Mayor &c. of Americus v. Perry*, 114 Ga. 871, 881 (40 SE 1004) (1902).

[68] *Greer v. State of Georgia*, 233 Ga. 667, 669 (212 SE2d 836) (1975).

[69] *Morrison v. Olson*, 487 U. S. 654, 693-694 (108 SC 2597, 101 LE2d 569) (1988) (punctuation omitted).

[70] *Morrison*, 487 U. S. at 694, quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U. S. 579, 635 (72 SC 863, 96 LE 1153) (1952) (Johnson, J., concurring).

[71] *Morrison v. Olson*, 487 U. S. at 694.

[72] Id. at 695, quoting *Nixon v. Administrator of General Services*, 433 U. S. 425, 443 (97 SC 2777, 53 LE2d 867) (1977).

branch powers and functions.

The core legislative function is the establishment of public policy through the enactment of laws.[73] Reapportionment of state legislative districts is a unique aspect of this legislative function.[74] As the U. S. Supreme Court has recognized, reapportionment of a state legislature is the "most political of legislative functions."[75] Thus, the expressed intent of the legislative body to prefer one reapportionment scheme over another is plainly proper and within the sphere of legislative power. Nothing prevents the legislature from expressing this intent through a fallback or contingency provision.[76]

On the other hand, the executive branch generally has the power and authority to control litigation as part of its power to execute the laws,[77] and a law that removes from the executive branch sufficient control of litigation may well violate separation of powers.[78] However, the executive branch does not have the authority to decline to execute a law under the guise of executing the laws: "To contend that the obligation imposed . . . to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the Constitution and entirely inadmissible."[79] The power to forbid the execution of the laws would enable the executive branch to nullify validly enacted statutes. In that situation, the executive branch would encroach upon the legislative power to repeal statutes[80] or upon the judicial branch's power of judicial review.[81] What the executive branch cannot do directly, it cannot do indirectly. Thus, even though the executive branch generally has the power and authority to control litigation, it cannot exercise this power in order to prevent the execution of a law.

Balancing these principles in light of this case, we conclude that the legislature may require an appeal to the U. S. Supreme Court so

---

[73] Ga. Const. art. III, sec. I, para. I; *Commonwealth Investment Co. v. Frye*, 219 Ga. 498, 499 (134 SE2d 39) (1963) ("the legislature . . . [is] empowered by the Constitution to decide public policy, and to implement that policy by enacting laws").

[74] Ga. Const. art. III, sec. II, para. II.

[75] *Davis v. Bandemer*, 478 U. S. 109, 143 (106 SC 2797, 92 LE2d 85) (1986).

[76] See *Bowsher v. Synar*, 478 U. S. 734, 735 (106 SC 3181, 92 LE2d 583) (1986) (noting Congress's passage of fallback provisions in Balanced Budget and Emergency Deficit Control Act, in event any of the provisions were invalidated).

[77] *Buckley v. Valeo*, 424 U. S. 1, 138 (96 SC 612, 46 LE2d 659) (1976) (per curiam).

[78] See *Morrison v. Olson*, 487 U. S. at 695-696 (independent counsel law does not violate separation of powers even though it reduces executive control over certain prosecutorial functions).

[79] *Kendall v. United States*, 37 U. S. (12 Pet.) 524, 613 (9 LE 1181) (1838).

[80] *INS v. Chadha*, 462 U. S. 919, 954 (103 SC 2764, 77 LE2d 317) (1983).

[81] Id. at 941-942; *Nixon*, 433 U. S. at 443; *Marbury v. Madison*, 5 U. S. (1 Cranch) 137, 177 (2 LE 60) (1803) ("[I]t is emphatically the province and duty of the judicial department to say what the law is."). See also *Modern Homes Constr. Co. v. Burke*, 219 Ga. 710, 715 (135 SE2d 383) (1964) ("[statutory] construction belongs to the courts").

that the legislature's preferred reapportionment scheme be implemented. The intrusion by the legislature into the executive branch function of control of litigation is justified by the limited nature of the encroachment – pursuit of one case – and by the subject matter of the litigation – legislative reapportionment. Our conclusion is supported by the holding in *Sixty-Seventh Minnesota State Senate v. Beens*,[82] in which the U. S. Supreme Court held that a state senate is a proper party to intervene in litigation challenging an apportionment plan. If one house may intervene to protect its interests in apportionment, then it is also permissible for the legislature to direct that its reapportionment plan be fully defended in court.

Because the legislative encroachment into the executive power of controlling litigation is limited to carrying out the legislature's chosen reapportionment plan, it does not impermissibly intrude into executive branch functions and does not constitute a separation of powers violation. The dissent's dire prediction of a political and constitutional crisis is possible only because it ignores the uniqueness of legislative reapportionment.

## CONCLUSION

The Constitution mandates that the Attorney General perform "such other duties as shall be required by law." Act 444 suspends the operation of the new redistricting provisions "pending a final determination of their enforceability under the federal Voting Rights Act of 1965," which requires federal court resolution. Accordingly, when the Attorney General declined to dismiss the appeal, he was fulfilling a duty required by Act 444. Because the Attorney General was acting consistently with his constitutional and statutory duties, we conclude that the Governor does not have a clear legal right to compel the Attorney General to dismiss the appeal or case from the courts. Therefore, the Governor is not entitled to the writ of mandamus.

*Judgment affirmed. All the Justices concur, except Carley and Hines, JJ., who dissent.*

BENHAM, Justice, concurring.

In my dissent to the denial of appellee's motion to dismiss, I explained why I believe this matter is moot (*Perdue v. Baker*, 276 Ga. 822 (586 SE2d 303) (2003)), and I adhere to that belief. However, the denial of the motion to dismiss establishes as the law of the case that the matter is not moot. That being so, I concur in the affirmance of

---

[82] 406 U. S. 187, 194 (92 SC 1477, 32 LE2d 1) (1971) (per curiam); see also *Coleman v. Miller*, 307 U. S. 433 (59 SC 972, 83 LE 1385) (1939) (legislators who cast votes sufficient to defeat act, had standing to sue when act nevertheless became effective).

the judgment below.

CARLEY, Justice, dissenting.

The Governor of Georgia exercises "chief executive powers," and the Attorney General of this state serves "as the legal advisor of the executive department." Art. V, Sec. II, Par. I and Art. V, Sec. III, Par. IV of the Ga. Const. of 1983. Ideally, these two constitutional officers will set aside any differences and disagreements, and work together in the performance of the duties that each individually owes to the citizens who elected them. In the unfortunate occurrence of an irreconcilable disagreement between them, however, only one can prevail. In this case, we are called upon to decide who has the ultimate authority to terminate civil litigation in which the state is a party. Resolution of that issue does not turn on policy considerations as to which of them *should* have that authority. Instead, we must determine in whom the power is vested under existing law. "The duties and powers of the attorney-general of this State are limited by the provisions of the constitution and statutes. . . ." *Walker v. Ga. R. and Power Co.*, 146 Ga. 655, 656 (92 SE 57) (1917). In my opinion, the constitution and laws of Georgia clearly and unambiguously provide that Governor Perdue's authority in this matter is paramount. Therefore, I believe that the trial court erred in denying mandamus to compel Attorney General Baker to comply with the Governor's directive to end the appeal of the federal district court's decision invalidating the original senate redistricting plan. Accordingly, I respectfully dissent from the majority's affirmance of the trial court's judgment, and in so doing I share the thoughts expressed by a Justice of this Court fifty-six years ago dissenting in a case which also materially affected the operation of the government of the State of Georgia:

I would much prefer, if it were possible to do so in a case of such great importance, to join in the majority opinion of my learned colleagues rather than dissent from the conclusions of law at which they have arrived. However, having resolved the questions as best I could, and having reached a decided conviction contrary to that expressed by the majority, with due modesty I trust as one of two dissenters, and with all deference to [the Justices in the] majority . . ., I feel it incumbent upon me to state for the record, as briefly as I can but as fully as is necessary, the reasons which have impelled me to arrive at a different legal conclusion. While it is true that the majority opinion is the judgment of the court and therefore becomes the law of the land, it is also true that in the development of American jurisprudence the dissenting

opinion is believed to have ofttimes played a useful part.

*Thompson v. Talmadge*, 201 Ga. 867, 890-891 (41 SE2d 883) (1947) (Jenkins, C. J., dissenting). Giving full expression to my departure from the majority's analysis is especially important where, as here, it characterizes its own holding as "limited" and based upon the "uniqueness" of the legal area into which it approves "legislative encroachment into the executive power of controlling litigation. . . ." Majority opinion, p. 15.

## THE GEORGIA CONSTITUTION

The Georgia Constitution places the responsibility for ensuring that "the laws are faithfully executed" on the Governor, Art. V, Sec. II, Par. II of the Ga. Const. of 1983, and does not contain any comparable language conferring similar plenary authority on the Attorney General. Although he is also a constitutional officer and cannot be discharged by the Governor, the Attorney General is still subject to the same rules and regulations of the State Bar as is any other lawyer. Art. V, Sec. III, Par. II (b) of the Ga. Const. of 1983. In his professional capacity as a member of the bar, he represents Georgia "in all civil and criminal cases in any court *when required by the Governor. . . .*" (Emphasis supplied.) Art. V, Sec. III, Par. IV of the Ga. Const. of 1983. The Governor can exercise any power which "is expressly given *or* arises by necessary implication under the constitution or the statutes of the State . . . ." (Emphasis supplied.) *Holder v. Anderson*, 160 Ga. 433, hn. 2 (128 SE 181) (1925). If, in ensuring that the laws are faithfully executed, the Governor has the express constitutional authority to require that the Attorney General represent the state in a legal action, then the Governor must necessarily possess the concomitant implied power to direct the Attorney General to end the litigation. The power to require action implies the power to terminate it.

Certainly, nothing in our state constitution expressly authorizes the Attorney General to continue pursuing a lawsuit when the Governor directs him to cease doing so. Moreover, such unilateral authority would be completely inconsistent with a lawyer's professional role. "The scope of an attorney's authority when retained to prosecute or defend a pending case is determined by the terms of his contract of employment, and *the instructions given by his client. . . .*" (Emphasis supplied.) *Dean v. Jackson*, 219 Ga. 552 (134 SE2d 601) (1964). "An attorney of record is a party's agent in the prosecution of a legal action." *Shepherd v. Carlton's Nice Cars*, 149 Ga. App. 749, 750 (256 SE2d 113) (1979). If the Attorney General is an agent when pursuing litigation on behalf of the state, then he obviously cannot

also be the principal. The constitution does not provide that he serves as an independent counsel for Georgia, but as the legal advisor and advocate for the executive branch of state government of which the Governor is the undisputed head. Therefore, the Attorney General is the lawyer upon whom the executive branch relies to carry out the Governor's constitutional obligation to execute this state's laws faithfully.

> As advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications. As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system.

Preamble (2) to the Rules of Professional Conduct of the State Bar of Georgia.

Thus, it is clear that the Attorney General's constitutional role is to advise and to represent the executive branch, and not to defy the Governor's order to discontinue pursuit of a lawsuit on behalf of the state.

> Both lawyer and client have authority and responsibility in the objectives and means of representation. *The client has ultimate authority to determine the purposes to be served by legal representation,* within limits imposed by law and the lawyer's professional obligations. (Emphasis supplied.)

Comment (1) to Rule 1.2 of the Rules of Professional Conduct of the State Bar of Georgia. The Governor is free to disregard the legal advice he receives and, if he does, his policy decision and instructions must control. Former Governor Barnes supported the Attorney General's appeal of the decision of the federal district court. However, Governor Perdue now heads the executive branch of the government of the State of Georgia. He has the same constitutional authority to make policy decisions regarding litigation involving the state as did his predecessors in office. Likewise, the Attorney General does not have any more discretion to ignore the instruction to end the lawsuit than he had to disregard a direction by the then head of the executive branch to initiate the appeal.

The Attorney General's lack of constitutional authority to defy the Governor's directive is apparent not only from the unambiguous text of our Constitution, but also from the transcripts of the proceedings leading to its creation. Prior to the adoption of the Constitution of 1983, an effort was made on two occasions to include in it language that would expressly grant the Attorney General the power to proceed in civil cases without regard to the Governor's wishes. See Select

Comm. on Const. Rev., Subcomm. on the Judiciary, September 9, 1977 at 34-35; Additional Materials for Select Comm. on Const. Rev., Legis. Overview Comm., Aug. 7, 1981 at 60, 61 (10) (Aug. 3, 1981 memorandum from Melvin B. Hill, Jr.). However, both efforts failed. These unsuccessful attempts to change the draft of the proposed Constitution are critically important because, "[i]n determining the meaning of a provision of the Constitution, due consideration should be given to the intention of its framers." *Houlihan v. Saussy*, 206 Ga. 1, 3 (55 SE2d 557) (1949). To accept the Attorney General's position as to the unbridled scope of his authority requires, in effect, a judicial "amendment" of the Constitution so as to add a provision which was considered and rejected by those charged with drafting it. That result is precluded by this Court's obligation "to construe and apply the Constitution as it is now written." *Buford v. Buford*, 231 Ga. 9, 12 (200 SE2d 97) (1973), overruled on other grounds, *Ledford v. Bowers*, 248 Ga. 804, 807 (2) (d) (286 SE2d 293) (1982). As written, the Constitution does not provide that the Attorney General, in his capacity as Georgia's attorney of record, is authorized to ignore the Governor's directive to end a lawsuit. To the contrary, the Governor, as does any other client, makes the policy decision on whether or not to proceed with litigation, and the Attorney General, as does any other lawyer, has the tactical and strategic responsibility for implementing that decision.

## GEORGIA STATUTES

The Attorney General is also authorized to "perform such other duties as shall be required by law." Art. V, Sec. III, Par. IV of the Ga. Const. of 1983. However, acting in defiance of a direct order from the head of the executive branch of government for which he serves as the legal advisor is not a "duty." Instead, it constitutes an exception to the lawyer's traditional role as an agent for a party to litigation. It is a

> well-settled legal principle recognized in various decisions of the courts of last resort in this country . . . that where the constitution creates an office and prescribes the duties of the holder thereof, and declares that other duties may be imposed on him by statute, he has no authority to perform any act not legitimately within the scope of such statutory and constitutional provisions.

*Walker v. Ga. R. & Power Co.*, supra at 656. Thus, the power to ignore the Governor's directive must derive "legitimately" from some duty imposed upon the Attorney General by statute.

Certainly, there is not any statute which expressly grants the

Attorney General the power to disregard the Governor's order to discontinue litigation to which the state is a party. To the contrary, the

> Governor shall have the power to direct the Department of Law, through the Attorney General as head thereof, to institute and prosecute in the name of the state such matters, proceedings, and litigations as he shall deem to be in the best interest of the people of the state.

OCGA § 45-15-35. "Unless otherwise specially provided for, the Governor, in his discretion, shall provide for the defense of any action instituted against the state. . . ." OCGA § 45-12-26. Reading these enactments together, it is clear that the Governor has the discretionary authority to defend the state in whatever manner he deems appropriate, and that he can direct the Department of Law to represent the state in civil actions according to his determination of the best interest of the citizens of Georgia.

For his part, the Attorney General is generally authorized to "represent the state in all civil actions tried in any court . . . ." OCGA § 45-15-3 (6). In carrying out this statutory duty, the Attorney General, on his own motion, may be authorized to initiate and defend litigation in which the state is a party. The state constitution merely provides that the Attorney General "shall" represent the state when "required" to do so by the Governor. It does not expressly limit the Attorney General's authority by requiring that he obtain the Governor's approval *prior* to initiating or defending each and every action for or against the state. However, the dispositive issue is not whether the Attorney General can independently file or defend a lawsuit, but whether he can either refuse to institute an action or continue to litigate an issue *after* the Governor has instructed him to the contrary.

> We are inclined to the opinion that the attorney-general has the power to institute suits necessary to the protection of the interests of the State; in case, for instance, where the State's property is involved, or where public rights are jeopardized, without direction from the Governor; *but when directed by the Governor, as in this case, to proceed, he has no discretion in the matter, but should obey the mandates of the chief executive.* (Emphasis supplied.)

*Trust Co. of Ga. v. State of Ga.*, 109 Ga. 736, 746-747 (1) (35 SE2d 323) (1900). Since that case was decided, the General Assembly has not expressly empowered the Attorney General to act independently of the Governor's direction. Thus, the Attorney General's power remains subject to the Governor's discretion, and he does not have any legitimate statutory basis to defy the order to end the litigation.

## ACT 444

The majority ultimately bases its holding upon Act 444, stating that, "[b]y appealing, the Attorney General was fulfilling his general duty as chief legal officer to execute state law and his specific duty to defend the reapportionment law as enacted by the General Assembly." Majority opinion, p. 12. Even assuming that to be a correct statement, it has no bearing on the disposition of this case. No one questions the authority of the Attorney General to *initiate* the appeal. The crucial issue is whether the Attorney General can defy the Governor's directive to withdraw the appeal.

The majority points to nothing in Act 444 which addresses the relative authority of the Governor and Attorney General with regard to the litigation involving the original senate redistricting plan. The statute simply suspended the provisions of the plan *"pending a final determination* of their enforceability under the federal Voting Rights Act of 1965, as amended." (Emphasis supplied.) Ga. L. 2002, pp. 148, 149, § 1 (d). It neither specifies how the "final determination" will be made nor who decides what constitutes a "final determination." Thus, there is not any language in Act 444 which expressly removes it from the general constitutional mandate that, as a law of this state, its faithful enforcement is a discretionary matter for the Governor, in his capacity as the head of the executive branch. "[T]he executive branch . . . enforce[s] the statutes passed by the General Assembly until such time as they are amended or [stricken] by the courts." *Adams v. Ga. Dept. of Corrections*, 274 Ga. 461, 462 (553 SE2d 798) (2001). Because a federal district court had already held that the original senate redistricting plan violated the Voting Rights Act, a "final determination" of the enforceability of that plan would result from the Governor's policy determination that the ruling was correct. Nothing requires the executive branch to exhaust every avenue of appellate review, and declining to pursue an appeal is a valid exercise of executive discretion. In fact, there have been numerous instances in which the federal courts struck down state statutes, and the executive branch, in the exercise of its discretion, elected to forgo an appeal. See *Tillman v. Miller*, 133 F3d 1402 (11th Cir. 1998); *Statewide Detective Agency v. Miller*, 115 F3d 904 (11th Cir. 1997); *American Civil Liberties Union of Ga. v. Miller*, 977 FSupp. 1228 (N.D. Ga. 1997); *Southern States Landfill v. Georgia Dept. of Natural Resources*, 801 FSupp. 725 (M.D. Ga. 1992); *Fernandez v. State of Ga.*, 716 FSupp. 1475 (M.D. Ga. 1989). As exemplified by those cases, any question of the enforceability of the original reapportionment plan should have been resolved once the Governor determined to end the appeal from the federal district court decision. The authority for the Attorney General to defy the Governor which the majority reads

into Act 444 is, in fact, contrary to the express terms of that statute. The law requires only a "final determination," not an exhaustion of the appellate process.

## SEPARATION OF POWERS

The majority acknowledges that an act of the General Assembly violates the constitutional doctrine of "separation of powers when it increases legislative powers at the expense of the executive branch" or " ""prevent(s) the Executive Branch from accomplishing its constitutionally assigned functions," ' even if it does not increase legislative powers." Majority opinion, p. 13. Furthermore, the majority concedes that the validity of its holding is completely dependent upon "whether Act 444 inappropriately intrudes upon Executive Branch powers and functions." Majority opinion, p. 13. Admittedly it is not always easy to determine the line between executive and legislative functions. *Greer v. State of Ga.*, 233 Ga. 667, 669 (1) (212 SE2d 836) (1975). However, one area where the distinction should be absolutely clear is the control over litigation to which the state is a party. A lawsuit is the ultimate remedy to ensure compliance with the law, and our Constitution unequivocally imposes the responsibility for the faithful enforcement of the laws upon the Governor, and not upon the General Assembly. See Art. V, Sec. II, Par. II of the Ga. Const. of 1983; *Adams v. Ga. Dept. of Corrections*, supra at 462. See also *Buckley v. Valeo*, 424 U. S. 1, 138 (IV) (B) (3) (96 SC 612, 46 LE2d 659) (1976). The Constitution contains no language purporting to *limit* the control of the executive branch over certain types of litigation. The General Assembly is certainly authorized to reapportion itself. Art. III, Sec. II, Par. II of the Ga. Const. of 1983. However, the Constitution does *not* provide that, in connection with litigation involving reapportionment, the legislative, rather than the executive branch, exercises the power of control. According to the majority, the executive branch *"generally* has the power and authority to control litigation as part of its power to execute the laws. . . ." (Emphasis supplied.) Majority opinion, p. 14. However, it does not point to anything showing that the authority of the executive branch in that regard is not exclusive or that it does not include control over litigation involving reapportionment.

Thus, the conclusion on page 15 of the majority opinion that "[t]he intrusion by the legislature into the executive branch function of control of litigation is justified by the limited nature of the encroachment – pursuit of one case – and by the subject matter of the litigation – legislative reapportionment," is a complete fiction which is contrary to the unambiguous provisions of the Georgia Constitution. Because the constitutional grant of authority to the executive

branch of control over litigation involving the state is unqualified, *any* legislative effort to encroach thereon, no matter how limited, would violate the principle of separation of powers. See Art. I, Sec. II, Par. III of the Ga. Const. of 1983. In *Massenburg v. Commissioners of Bibb County*, 96 Ga. 614, 617 (23 SE 998) (1895), this Court

> announc[ed] a fundamental principle of our State government under the Constitution. A departure from that high principle might well endanger the stability of the entire governmental structure. It declares a rule of law that denies any implied or inherent right or power in the legislative department to exercise any power that has not by the sovereign people, through that Constitution, been reposed in the legislative department of government.

*Thompson v. Talmadge*, supra at 887 (2). By holding that, notwithstanding the express provisions of the Constitution placing the unqualified responsibility for enforcement of the laws upon the executive branch, the General Assembly can intrude into the control of litigation involving reapportionment, the majority necessarily departs from that "high principle." *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U. S. 187 (92 SC 1477, 32 LE2d 1) (1972) is not authority for ignoring the clear mandate of our Constitution. All that case holds is that one house of a state legislature can *intervene* in federal litigation challenging an apportionment plan. The power to intervene in a federal action is in no way comparable to the constitutional power to control the ultimate course of the litigation. Under the Constitution of Georgia, that power is exercised only by the Governor in his capacity as the head of the executive branch of this state's government.

As the majority does correctly note, one branch of government cannot do indirectly what it cannot do directly. However, the correct application of that principle in this case means that the General Assembly cannot impinge directly or indirectly on the authority of the executive branch to control litigation. *Thompson v. Talmadge*, supra at 887 (2). The Governor may not have the authority to decline to execute a law, but he certainly has the power to seek to avoid enforcement of a law that he believes encroaches on his constitutional powers. That is precisely what the Governor did when he brought this mandamus action to compel the Attorney General to act despite the provisions of any statute purporting to authorize his refusal to act. If, as the majority holds, Act 444 can be read as directing the Attorney General to maintain an appeal to the Supreme Court of the United States over the express objection of the Governor, then that statute would be an unconstitutional legislative

encroachment on the executive's power to enforce the laws. "If any department of government . . . acts beyond the bounds of its authority, such action is without jurisdiction, is unconstitutional, and is void." *Thompson v. Talmadge,* supra at 874 (1). Under our constitution, the Governor, not the General Assembly, is vested with the authority to enforce the laws and, consequently, to direct the Attorney General as to whether to appeal an adverse judicial ruling or to allow that ruling to become final. Act 444 "inappropriately intrudes" into the executive branch's control of litigation because, under our Constitution, no such intrusion would be authorized.

## CONCLUSION

The majority seeks to minimize the effect of its holding by characterizing it as one which is narrowly premised upon the "uniqueness of legislative reapportionment." Majority opinion, p. 15. As a dissenter, I am gratified that the majority recognizes that its decision has limited applicability and should not be cited in the future as general authority. In truth, however, broad and serious *constitutional and political implications* are inherent in today's decision, notwithstanding the majority's efforts to minimize its holding.

This case does not concern the power to reapportion. The sole issue is the power to control the course of litigation involving reapportionment. As to that controlling issue, the majority begins by positing generally that neither the Governor nor the Attorney General

> has the ultimate authority to decide what is in the best interest of the people of the State in every lawsuit involving the State of Georgia. . . . [They have an] overlapping responsibility . . . [in] a system of checks and balances within the executive branch so that no single official has unrestrained power to decide what laws to enforce and when to enforce them.

Majority opinion, p. 6. The Constitution does not provide for any such intra-executive branch "system of checks and balances," but confers the power to enforce the law exclusively upon the Governor, in his capacity as the head of that branch of government. Having ignored the clear language of the Constitution, the majority then promptly violates its own anomalous construction of that document by upholding the Attorney General's decision to ignore the Governor's directive. Obviously, the authority to pursue an appeal despite the objections of the head of the executive branch *is* the unrestrained power to decide what laws to enforce and when to enforce them. Thus, the majority's notion of a system of checks and balances in the executive branch is completely illusory. Only one official of the executive

branch can control the course of litigation and, according to the Constitution of this state, that official is the Governor.

Having conferred on the Attorney General a power which the Constitution vests exclusively in the Governor, the majority then purports to limit the exercise of that power to litigation involving reapportionment. However, there is nothing unique about reapportionment. It may be the most political of legislative functions, but it is still a legislative function. The relevant question is whether litigation involving reapportionment is an exception to the constitutional mandate placing enforcement of this state's laws in the hands of the Governor.

No such exception appears in our Constitution. The General Assembly's power to reapportion is no different than its power to enact "all laws not inconsistent with this Constitution, and not repugnant to the Constitution of the United States, which it shall deem necessary and proper for the welfare of the state." Art. III, Sec. VI, Par. I of the Ga. Const. of 1983. A reapportionment statute is just like any other law passed by the General Assembly. Litigation over the validity of a reapportionment act is a case just like any other civil action. Thus, the attempt to limit today's decision based upon the "uniqueness" of reapportionment is necessarily unavailing. If, as the majority holds, the General Assembly can pass legislation directing the Attorney General to appeal this particular judicial ruling, then it is also authorized to enact future laws to control him in the conduct of other cases in which the state is a party. The power to determine whether to appeal or to allow a judgment to become "final" is the power to control the litigation. Because the majority's attempt to limit its holding to reapportionment cases is baseless, that power has now passed from the executive to the legislative branch. The result is that the Attorney General will "win" this particular case, but the power of the office that he occupies, as well as the entire executive branch of government, is irrevocably diminished. Until today, the Attorney General, in his capacity as legal advisor to the executive branch, could be assured of direct and immediate input in the Governor's decision whether to appeal a ruling in a case in which the state is a party. However, that is now a decision which can be controlled by a majority vote of the members of the General Assembly. After conferring, the Governor and Attorney General may be in complete agreement as to which policy the executive branch should follow, but the General Assembly retains the ultimate authority to override them and to order that an appeal be pursued or abandoned. On the other hand, when the Governor and the Attorney General do disagree, there is no longer any incentive for mutual consultation and possible compromise. The Attorney General can flatly refuse to consider implementing the Governor's decision, thereby leaving the head

of the executive branch completely without legal representation. Each intra-executive branch stalemate over policy will then escalate into a political contest, with each constitutional officer seeking the General Assembly's enactment of a statute validating his or her position.

The fundamental fallacy in the majority's analysis is that it purports to rest on legislation, no matter how narrowly drawn. The Georgia Constitution provides that the General Assembly enacts our laws, whereas the Governor enforces them and the Attorney General serves as his legal advisor. The principle of separation of powers is "essential to the very foundation of our system of government" and must "be strictly enforced." *McCutcheon v. Smith*, 199 Ga. 685, 690-691 (2) (35 SE2d 144) (1945). A decision to terminate the appeal in the voting rights case may or may not have been wise policy. However, our constitution clearly confers the authority to make such policy determinations on the Governor, and the duty to implement that determination on the Attorney General. For the benefit of all of the citizens of Georgia, conflicts between the branches of government and disagreements between the elected constitutional officers of the executive are to be avoided if at all possible. Far from the narrow holding portrayed by the majority, however, I submit that today's opinion sows the seeds of a constitutional and political crisis which could and should be avoided simply by this Court following its own mandate to interpret the Georgia Constitution as it is written.

I am authorized to state that Justice Hines joins in this dissent.

DECIDED SEPTEMBER 4, 2003.

*Frank C. Jones, Cushing, Morris, Armbruster & Montgomery, Kirk M. McAlpin, Jr., Carlton M. Henson, Kelly R. Burke, District Attorney*, for appellants.

*Jeffrey L. Milsteen, Michael E. Hobbs, Deputy Attorneys General, Rogers & Hardin, Richard H. Sinkfield, Robert B. Remar, Ashley R. Hurst, Julie K. Bracker*, for appellees.

*David G. Oedel, John O. Cole, Anne S. Emanuel, Bondurant, Mixson & Elmore, Emmet J. Bondurant, Michael B. Terry, Jeffrey O. Bramlett, Randi E. Schnell, William H. Pryor, Jr., Attorney General of Alabama, Margaret H. Fleming, Assistant Attorney General of Alabama, Nathan A. Forrester, Solicitor-General of Alabama*, amici curiae.